Cornelius H. LUCAS, Lawrence W. Cable, Edwin M. Feeser, for themselves and on behalf of others similarly situated, Plaintiffs,

v.

The SEAGRAVE CORPORATION, Hupp Corporation and Great West Life Assurance Company, Defendants.

Civ. No. 4-66-420.

United States District Court
D. Minnesota,
Fourth Division.

Nov. 1, 1967.

339

Johnson & Thompson, by Charles E. Spring, Minneapolis, Minn., for plaintiffs.

Maslon, Kaplan, Edelman, Joseph & Borman, by Stephen B. Swartz and Harvey F. Kaplan, Minneapolis, Minn., for defendant Seagrave Corporation.

Lasley, Foster & Roehrdanz, by George M. Roehrdanz, Minneapolis, Minn., for defendant Hupp Corporation.

Rider, Bennett, Egan, Johnson & Arundel, by Wm. T. Egan and Donald R. Backstrom, Minneapolis, Minn., for defendant Great West Life Assur. Co.

MILES W. LORD, District Judge.

This matter is before the Court on the several motions of defendant Seagrave. The plaintiffs are residents of Minnesota. Defendants Seagrave Corporation, Hupp Corporation and Great West Life Assurance Company are foreign corporations doing business in Minnesota. The motions are submitted upon affidavits and briefs of the parties and oral arguments.

The complaint alleges that the named plaintiffs and others similarly situated achieved the status of beneficiaries of a non-contributory employee annuity plan of the defendant Seagrave Corporation. The complaint further alleges that the class of employees represented by plaintiffs were discharged by Seagrave and thereby denied their benefits under the

plan. Plaintiffs seek relief on the theory that:

1. The discharge and termination of the class of employees constituted a partial termination of the pension plan in accordance with the Internal Revenue Code which requires a distribution of accrued benefits upon such an occurrence;

2. Plaintiffs were induced to rely upon the pension plan to their detriment, consequently defendants are estopped to deny them benefits; and

3. Defendants were unjustly enriched as a result of having received tax benefits and have and will continue to benefit from a reduction of contributions to the plan as a result of denying the accrued benefits to plaintiffs.

Defendant Seagrave moves the Court as follows:

(a) For summary judgment to the effect that plaintiffs' allegations 1 and 3 above fail to state a claim upon which relief can be granted;

(b) For an order determining that no class action may be maintained in this case;

(c) For an order dismissing or severing the claims of the named plaintiffs on the grounds of misjoinder; and

(d) For an order dismissing the claim of plaintiff Lawrence W. Cable on the grounds that his claim does not satisfy the $10,000 jurisdictional requirement.

The complaint and affidavits disclose that since August 1, 1965, defendant Seagrave has operated its Flour City Architectural Metals Division with principal offices in Minneapolis. The assets and property used by Seagrave in the operation of this division were acquired from defendant Hupp Corporation which had acquired the Flour City operation in 1960. In conjunction with its purchase of assets and property from Hupp, Seagrave took an assignment of the interest of Hupp in a noncontributory pension plan represented by an annuity insurance contract with defendant Great West. It appears that subsequent to the date of Seagrave's purchase approximately 30 of the 65 employees participating in the plan, several of them with long service to Flour City, were discharged by Seagrave or terminated their employment. At this point the facts are disputed. Plaintiffs assert that the employees were discharged or pressured into resigning by Seagrave pursuant to an intent to ultimately terminate the plan after the employees' benefit forfeitures (which were credited toward Seagrave's contributions to the plan) were exhausted. Because of this Seagrave has paid no contributions from the time it purchased Flour City. Further, plaintiffs contend that because of defendant's intent in this regard, the severance of the class of employees must be viewed as a mass discharge rather than isolated individual terminations. The defendant Seagrave is silent concerning plaintiffs' allegations of an intent to terminate the plan, it merely asserts that the plan has continued. However, Seagrave does controvert plaintiffs' allegation of group termination, viewing it as individual firings and terminations, some for "cause". In any event, the discharges and terminations occurred over a period of approximately one year; the substantial portion of them on the date Seagrave assumed control of the business.

The Great West policy, which established the plan on October 26, 1955, provides, in summary, that premium payments sufficient to purchase an annuity of a specific amount upon "normal retirement" (65) are paid annually by the employer with respect to each eligible employee. Upon attaining retirement age, the employee is entitled to the annuity. (Sections 2, 4 and 5 of the policy.) In the event the employer ceases making premium payments, the accumulated benefits are used to purchase paid-up annuities for the participants of the plan. (Sections 9 and 11.) If an employee is terminated prior to normal retirement age, the accumulated benefits for such employee also terminate and the employer may credit this accumulation to the next annual premium obligation. There are sections of the policy

evidently designed to comply with the qualification criteria of the Internal Revenue Code (e. g. Sec. 24). The "plan termination" apparently contemplated by the policy is upon "Cessation of premium payments" which may occur upon (1) any failure of the employer to comply with the terms of the policy, or (2) the number of employees covered is less than 25, or (3) a liquidator or receiver of the employer's business is appointed (Secs. 9 and 11). Upon such event, Great West in its discretion may refuse to receive further premiums.

I. The internal Revenue Code of 1954 provides:

> Code Section 401(a) (7) "A trust shall not constitute a qualified trust under this section, unless the plan of which such trust is a part provides that, upon its termination or upon complete discontinuance of contributions under the plan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable. This paragraph shall not apply to benefits or contributions which, under provisions of the plan adopted pursuant to regulations prescribed by the Secretary or his delegate to preclude the discrimination prohibited by paragraph (4), may not be used for designated employees in the event of early termination of the plan."
> Regulation Section 1.401–6 "Termination of a qualified plan.—
> "(a) General rules. (1) In order for a pension, profits sharing, or stock bonus trust to satisfy the requirements of Section 401, the plan of which such trust forms a part must expressly provide that, upon the termination of the plan or upon the complete discontinuance of contributions under the plan, the rights of each employee to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the rights of each employee to the amounts credited to his account at such time, are nonforfeitable. As to what constitutes nonforfeitable rights of an employee, see paragraph (a) (2) of Section 1.-402(b)–1.
> *      *      *      *      *
> (b) Termination defined. (1) Whether a plan is terminated is generally a question to be determined with regard

## (1) THE INTERNAL REVENUE CODE

The plaintiffs assert that the policy is silent as to the effect of a sale of the corporation with large numbers of employee discharges. Since the plan purports to be "qualified" under the Internal Revenue Code, the alleged mass discharge constitutes "partial termination" of the plan and vesting of the employees' pension benefits in accordance with Sec. 401(a) (7)[1]. Seagrave moves for summary judgment on the ground that this count fails to state a claim upon which relief may be granted.

to all the facts and circumstances in a particular case. For example, a plan is terminated when, in connection with the winding up of the employer's trade or business, the employer begins to discharge his employees. However, a plan is not terminated, for example, merely because an employer consolidates or replaces that plan with a comparable plan. Similarly, a plan is not terminated merely because the employer sells or otherwise disposes of his trade or business if the acquiring employer continues the plan as a separate and distinct plan of its own, or consolidates or replaces that plan with a comparable plan. See paragraph (d) (4) of Section 1.381(c) (11)–1 for the definition of comparable plan. In addition, the Commissioner may determine that other plans are comparable for purposes of this Section.

(2) For purposes of this section, the term "termination" includes both a partial termination and a complete termination of a plan. Whether or not a partial termination of a qualified plan occurs when a group of employees who have been covered by the plan are subsequently excluded from such coverage either by reason of an amendment to the plan, or by reason of being discharged by the employer, will be determined on the basis of all the facts and circumstances. Similarly, whether or not a partial termination occurs when benefits or employer contributions are reduced, or the eligibility or vesting requirements under the plan are made less liberal, will be determined on the basis of all the facts and circumstances. However, if a partial termination of a qualified plan occurs, the provisions of Section 401(a) (7) and this section apply only to the part of the plan that is terminated."

Although, as plaintiffs contend, the policy demonstrates some intention to qualify for deductions under the tax laws, it does not follow that, the policy being silent or ambiguous, the Internal Revenue Code acts to vest rights in the terminated employees. The Court feels that a less ambiguous demonstration of intent is necessary in order to draw such a conclusion. A specific indication of an intention to use the provisions of the Internal Revenue Code to interpret or define terms of the contract is absent. Given this absence, it seems fairly clear that the tax provisions are relevant only to the tax status of the plan. Thus, without a more demonstrable intention to abide by the Code's definitions, it would appear that the only consequence herein of the "partial termination" of a plan with the employer denying the accrued benefits would be a failure to qualify under the provisions so as to render improper an income tax deduction by the employer for its contributions. Barca v. Stein, 44 Misc.2d 68, 252 N.Y.S.2d 938, aff'd 24 A.D.2d 1080, 265 N.Y.S.2d 606 (1964); cf. Hudson v. John Hancock Mutual Life Ins. Co., 314 F.2d 16 at 21 (8th Cir. 1963). Consequently, it appears that this allegation by plaintiffs is insufficient. We conclude that there is no genuine issue of fact raised on this question and summary judgment is a proper disposition of plaintiff's contention.

### (2) QUASI-CONTRACT

Plaintiffs allege in Counts 2 and 3 of their complaint that, the contract constituting the pension plan aside, there is a right of recovery on a theory of quasi-contract for the value of that part of their services for which the plan contributions were to be compensation. They contend that the pension constituted a form of compensation that they were induced to rely upon, and did so rely, to their detriment and that the defendant Seagrave was consequently unjustly enriched. Seagrave moves for a summary judgment on the unjust enrichment count.

Courts have been uniformly reluctant to grant terminated employees vested rights in a non-contributory pension fund where the terms of the pension contract have not been literally met. Some courts find that such pension plans constitute a mere arrangement for a gratuity and the employer as donor has the unlimited right to fix the terms and conditions of the gift. Neuffer v. Bakery & Confectionery Workers International Union, 193 F.Supp. 699 (D.C.Dist.Col. 1961); see cases collected in 42 A.L.R.2d 461–487 at 464.

However, most often, private noncontributory pension plans have been held to give rise to contractual rights that vest upon the employee satisfying the terms of the contract; normally a specified number of years or attaining retirement age. 42 A.L.R.2d, supra, at 467-470. The courts which have considered situations analogous to the one before this Court have generally held that where group discharges have taken place as a result of plant shutdown or sale of the employer's operation, if none of the conditions for termination specified in the plan have occurred, the terminated employees have no rights in the fund where the plan continued for remaining employees. See Bailey v. Rockwell Spring & Axle Co., 13 Misc.2d 29, 175 N.Y.S.2d 104 (Sup.Ct.1958); George v. Haber, 343 Mich. 218, 72 N.W.2d 121 (1955); Schneider v. McKesson & Robbins, Inc., 254 F.2d 827 (2nd Cir. 1958); Karcz v. Luther Mfg. Co., 338 Mass. 313, 155 N.E.2d 441 (1959); cf. Hudson v. John Hancock Mutual Life Ins. Co., supra.[2] One of the leading cases support-

2. The only relevant cases discovered by the court allowing plan termination or disallowing forfeiture of accumulated benefits are Fernekes v. CMP Industries, Inc., 15 A.D.2d 128, 222 N.Y.S.2d 582 (1961), and Longhine v. Bilson, 159 Misc. 111, 287 N.Y.S. 281 (Sup.Ct.1936). *Fernekes* held that the sale of one of the company's two departments constituted such a substantial change and mass separation of employees that the plan was discontinued for that department. In *Longhine*, the court held that the provision calling for forfeiture of all plan rights upon discharge from employment did not contemplate mass separations

ing this approach is Gorr v. Consolidated Foods Corp., 253 Minn. 375, 91 N.W.2d 772 (1958). In that case the court stressed the fact that the plan detailed several conditions upon which termination would occur but did not include the mass termination accompanying a merger, sale or shutdown. Thus pension benefits were denied.

In the foregoing cases the courts have refused to vary or add to the terms of pension plans to accord rights not affirmatively conferred by the pension contracts themselves. However, this Court has found no decision which has ruled directly on the assertion of a quasi-contractual right of recovery of pension benefits on the basis that such benefits are essentially a form of compensation.

It is quite clear that pension plans which have been subject to union bargaining are generally treated by the employer, the affected employees and some courts as a part of the consideration for services performed. Inland Steel v. NLRB, 170 F.2d 247 (7th Cir. 1948) cert. denied 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949). In that context it appears understood that pension plan costs are a part of wage expenses and are commonly substituted for direct cash wages. It has become standard practice by courts and labor arbitrators to treat other fringe benefits such as vacations and severance pay as consideration for service accumulated during the time of employment so that failure to satisfy the literal terms of a plan because of dis-charge does not defeat employee rights. See Owens v. Press Publishing Co., 20 N.J. 537, 120 A.2d 442 (1956); Botany Mills Inc. v. Textile Workers Union, 50 N.J.Super. 18, 141 A.2d 107, 30 Lab.Arb. 479 (App.Div.1958); Brooklyn Eagle, Inc., 32 Lab.Arb. 156 (1959).[3] The recognized realities inherent in such an approach are even more persuasive in regard to retirement plans, whether bargained or not.

Obviously, income security after retirement is a primary objective of today's wage earner. Pension plans, whether imposed unilaterally or bargained for, represent an attempt by employers to attract and hold employees and to additionally compensate them in order to satisfy the common demand for future income security. Consequently, the employer receives favorable income tax treatment and other benefits derived from protective legislation.[4] Certainly the value of retirement security represented by a pension plan and its corresponding inducement to adhere to the employer tend to increase as an employee approaches retirement age. At this point the value of the pension to him may even overshadow his cash wages as consideration for his services.

A noncontributory unilaterally imposed plan is in no material respect different from a plan bargained for by a union in this regard. The *Inland Steel* case, in establishing the doctrine that pension contributions were compensatory, pointed out that the plan in question had been

---

and hence was inapplicable to the plaintiffs. *Fernekes* was reversed in 13 N.Y. 2d 217, 246 N.Y.S.2d 201, 195 N.E.2d 844 (1963) and *Longhine* distinguished and criticized in Schneider v. McKesson & Robbins, Inc., supra, at 829–830.

3. In a recent case, United Properties, Inc. v. Emporium Department Stores, Inc., 379 F.2d 55 (8th Cir. 1967), Judge Heaney cited with approval the language of Judge Johnsen concurring in Judd v. Wasie, 211 F.2d 826 at 833 (8th Cir. 1954) which stated:
"* * * an examination of the more recent decisions will show, I think, that the present general view is—and soundly so—that, on such an offer, if the employee remains in the service of the employer throughout the year, he has earned the right to the bonus as additional compensation for his services, and, if the business has net profits for the year, the employer owes him such additional compensation as a contractual obligation . from accepted offer." Note 3, pg. 55.

4. See generally Bernstein, Employee Pension Rights When Plants Shut Down; Problems and Some Proposals, 76 Harv. L.Rev. 952 (1963); Bernstein, Private Pension Eligibility; Some Problems And Proposals; The Practical Lawyer, Vol. 13, No. 1, p. 77 (1967).

initiated voluntarily by the employer years before it became a subject of union bargaining.[5] Thus, it would seem that it is not the demand to bargain that imparts a compensatory nature to company contributions but rather it is the benefit to the employees and the character of the inducement by the employer which makes pension contributions, in a real sense, compensation for service.

In 1956 the United States Senate Subcommittee on Welfare & Pension funds stated:

"These employer-employee plans, *whether or not collectively bargained, or whether contributed to solely by management,* or on a joint management-employee basis, actually, and under existing law, proceed on the basis that the contributions to them by management are in the nature of employees' compensation for employment or, stated in another way, *that the cost of the employee's service is greater than the amount currently paid them as wages.*"[6] (Emphasis added.)

The present decisions apparently give no weight or recognition to the existing and accepted characteristic of pension plans as a mode of employee compensation.

If the employer-pension contributions are viewed as a form of compensation, the question remains whether there is a right of recovery in quasi-contract for the value of the plan contributions given in lieu of cash wages. Plaintiffs suggest that the quasi-contractual doctrines of unjust enrichment and *restitutionary*

quantum meruit, rooted in personal service contract cases, provide such a right.[7]

A general statement of the rule is as follows:

"Where the defendant fails or refuses to perform his contract and is justified therein by the plaintiffs' own breach of duty or non-performance of a condition but the plaintiff has rendered a part performance under the contract that is a net benefit to the defendant, the plaintiff can get judgment * * * for the amount of such benefit in excess of the harm that he has caused to the defendant by his own breach in no case exceeding a ratable proportion of the agreed compensation, if the plaintiff's breach or non-performance is not wilful and deliberate. * * *" Restatement, Contracts, Sec. 357 (1932).[8] See 6 Williston, Contracts, § 1973 (1938); 6 Corbin, Contracts, §§ 1369–72 (1962).

Whether there should be any restitutionary recovery must be considered in connection with the equitable rules against forfeitures and the enforcement of penalties. 6 Corbin, Contracts, § 1122 (1962). If a plaintiff who has breached a contract by failure to fulfill a condition may recover for the benefit he confers, it would seem equitable that employees, who failed to perform the conditions of the pension plan (continued employment until retirement) because of a group termination, should be entitled to an amount equal to the benefit conferred on an employer. The employees' failure to fulfill the conditions of the pension contract is not wilful, indeed,

5. The holdings in United States v. Embassy Restaurant, Inc., 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959), and Sylvania Elec. Prods., Inc. v. NLRB, 291 F.2d 128 (1st Cir. 1961), cert. denied, 368 U.S. 926, 82 S.Ct. 360, 7 L.Ed. 2d 190 (1961), are the only opinions questioning the principle set out in *Inland Steel* and are both somewhat limited in scope. See Bernstein, supra, 961–962, n. 33.

6. See Rep. No. 1440, 85 Cong.2d Sess. 4 (1958), cited in Bernstein, supra, at 961, note 30.

7. See Restatement, Contracts, § 357, at 627 (1932).

8. Where the plaintiff fails to perform a condition by reason of impossibility or the consent of the defendant, it is inequitable to allow the defendant to retain the benefit of a part performance without paying for it. Id. § 357(1) comment c (Restatement, Contracts).

it is quite involuntary. The employer is not in a position to argue that he is harmed by a non-performance of the pension conditions, in fact, he causes it. Yet the employer retains the full benefit of the employee's past service and secures favorable income tax treatment as well as the recapture of the accumulated pension credits created by forfeitures.

Even if an employer has made no promise to vest pension benefits in employees upon their termination before reaching retirement age, this *may not* relieve him of an obligation to do so. In the analogous personal service contract cases, if an employer has made no promise that the employment would continue for any period of time and has a power to terminate at will, an exercise of this power does not leave him free of liability. There is a unilateral contract. An employer's act of termination operates only as a revocation of the employees' power of acceptance of the whole contract by continuing his service. The employer must still return benefits conferred by the employee as a result of his service. See cf. Brackenbury v. Hodgkins, 116 Me. 399, 102 A. 106 (1917) and 6 Corbin, Contracts § 1122 and § 152 (1962). Thus, it does not seem just or logical to say that employees' involuntary failure to perform the conditions for pension eligibility should erase all credits accrued under a plan when the performance is unwanted and, indeed, prevented by the employer.

█ It has been argued that, since the contracts so provide, employees are aware that their interests in the plan cease when their employment relationship is severed and that they take this risk. Schneider v. McKesson Robbins, Inc., supra; Gorr v. Consolidated Foods Corp., supra. However, a quasi-contractual recovery has been held available even though it appears that employees have agreed to assume the risk of contingencies which may render impossible the complete performance of a service contract. If it appears that the conditions were not inserted in the contract for such a contingency as had happened, recovery should be allowable for the benefit the employer has received. See 6 Williston, Contracts, §§ 1972A–1973 (1938) and cases cited; cf. Restatement, Contracts, § 468 (1932). Here, of course, the intention motivating the insertion of any conditions and the understanding of the employees is critical and parole evidence is indispensible in determining whether the express contract was made to cover the contingency which occurred. Thus, in this situation the question is whether a pension plan contract, providing for forfeitures of employee contribution benefits, anticipates the contingency of a group termination.

In this regard it has been asserted that an employer's pension plan contributions are determined by an actuarial formula which assumes that any employee whose employment is terminated forfeits his pension benefits. Schneider v. McKesson-Robbins, supra. However, such an assumption may not cover the occurrence of a group termination. The actuarial formula assumes a reasonable turnover rate for employees established by experience with individual separations over a period of time. Where there is a termination of a substantial number of the plan participants, it seems clear that such a turnover is not anticipated by the formula.[9] The result is that an employer who has discharged a relatively large number of employees receives a windfall, palpably in excess of actuarial assumptions, in the form of pension credit forfeitures which he can use to relieve for some time his future premium liability for the remaining employees. It seems unrealistic to say in this context, as some courts have, that the employer receives nothing. See Gorr v.

9. Bronson, Pension Plans-Provisions for Termination of Plan, 7 Transactions, Society of Actuaries 242 (1955); Bernstein, supra, at 968–972.

**346**

Consolidated Foods Corp., supra, 253 Minn. at 385, 91 N.W.2d at 778–79.[10]

Given the foregoing, it seems harsh to assert that employees assume knowingly the risk of all contingencies which might prevent their recovery of benefits; as if the plan were a negotiated contract agreed upon through arm's length bargaining. It hardly seems equitable to apply the literal contract language, which may not have been inserted to cover such a situation, to uncritically rule that employees bear the risk of a group termination which may not have been contemplated by the contract or the actuarial expectations upon which the plan is funded. Such a literal enforcement of plan provisions may defeat rather than foster plan purposes. This approach seems particularly unjustifiable where there may be indications of bad faith or where the doctrine of unjust enrichment is invoked.

It is perhaps reasonable to assume that even in a non-bargained plan employees are aware of and accept the risk of the common individual separation. But in that situation it may be said that the plan contract anticipates such contingencies and unjust enrichment may not result since these separations represent a reasonable turnover anticipated by the plan's actuarial formula. But where the substantial portion of a plan's participants are terminated and the employer benefits by recapturing his contributions, as well as by the years of employees' service at compensation less than the actual value of such service, it does not appear extreme or unfair to say that there may be a recovery on a quasi-contractual unjust enrichment theory.[11] At this stage of the record it is not clear whether the facts of the instant case justify such a recovery.

Plaintiffs assert that the discharges herein are best characterized as a group termination, a contingency, they contend, not intended to be covered by the express contract. Defendant Seagrave contends that the discharges and resignations were separate, individual, and specifically covered by the pension contract. This dispute necessitates further evidence in order to test the actual intent and understanding of the parties regarding the contract conditions and parole evidence may be vital. Moreover, since plaintiffs assert the compensatory nature of the pension plan, it is necessary to ascertain by further evidence the extent to which the parties treated it as such, if at all.

Further, plaintiffs' allegations of an intentional plan by defendant to unjustly recapture and exhaust plaintiffs' pension benefit forfeitures clearly question the good faith of defendant Seagrave. If plaintiffs could demonstrate that Seagrave intended to deprive them of their rights under the pension plan, it would seem to lend substantial support to their quasi-contractual theory of unjust enrichment. In such a situation it would seem "perilously near the perpetration of a fraud" to allow defendant Seagrave to retain benefits resulting directly from its improprietous activities. See 6 Williston, Contracts, § 1028 (1938). This factual controversy clearly demands trial.

At this point in the proceeding the Court cannot say that plaintiffs' statement of a claim is so insufficient that it is a certainty that they would not be entitled to relief under any conceivable state of facts in support of their claim. See Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1941); P. H. Machinery, Inc., v. Harnishfeger Corp., 207 F.Supp. 392 (D.Minn.1962); also

10. In that case Consolidated Foods obtained about $170,00 in premium credits as a result of the forfeiture of the separated employees' pension credits. Record, pp. 151–153, Ex. F, as cited in Bernstein, supra, at 955, n. 12. In the present case the premium credits amount to approximately $50,000. Affidavit of Cornelius H. Lucas, Pa. 4.

11. It is submitted that a recovery in such a situation is actuarially manageable and will not act to dilute the interests of the employees who remain participants since the only funds accessible to recovery are those accumulated credits of the employees who were terminated.

Traylor v. Black, Sivalls-Bryson, Inc., 189 F.2d 213 (8th Cir. 1951). Consequently, defendants motion for summary judgment is denied.

(3) Defendant Seagrave also requests the Court for an order determining that no class action may be maintained in this case.

■ Defendant Seagrave contends that none of the necessary prerequisites for maintaining a class action under amended Rule 23(a) and (b), Fed.Rules of Civ.Proc., 28 U.S.C., is present in this action. The Court disagrees. However, without ruling on the remainder of defendant's objections, it is sufficient to hold that the plaintiffs have failed to demonstrate that the class is so numerous that joinder of all members is impracticable.[12] The new amended rule has not affected this requirement which must be demonstrated positively by the plaintiffs. 2 Barron & Holtzoff, Fed. Prac. & Proc., § 562.4 (1966 Supp. p. 78, Wright ed.) Plaintiffs' affidavits indicate that all of the members of the contemplated class have been notified concerning the existence of this action and that a large percentage of them are already participating in the suit. Plaintiffs' contention that the small size of the various claims makes joinder impracticable is not responsive to the directive of the rule. This is not to say that the class is too small, but only that it appears that joinder of the other members of the purported class could be effected with relative ease. See Crawford v. Texaco, Inc., 40 F.R.D. 381 at 385 (S.D.N.Y.1966). Since this requirement of Rule 23(a) has not been met, this suit is not now maintainable as a class action.

(4) Defendant Seagrave moves the Court for an order dismissing or severing the claims of the named plaintiffs on the ground of misjoinder.

■ The Court feels that the defendant's contentions on this question are without merit. Suffice it to say that the joinder of these plaintiffs would constitute at the very least permissive joinder under the Federal Rules because their various and several claims all arise out of the same transaction or occurrence, or series of interrelated transactions. The common questions of law and fact obviously exist and have arisen already in this action. Rule 20(a) Fed.Rules of Civil Procedure. See 2 Barron & Holtzoff, supra, § 532. (1966 Supp. p. 49, Wright ed.) Defendants' motion to dismiss or sever the claims of plaintiffs is denied.

(5) Finally, defendant requests an order dismissing the claim of plaintiff Lawrence W. Cable on the ground that his claim does not satisfy the $10,000 jurisdictional amount requirement [28 U.S.C. § 1332(a)].

■ Defendant contends that plaintiffs have aggregated their separate claims in order to satisfy the jurisdictional amount requirement. This action has been brought as a class suit in which the alleged amount in controversy satisfied the required jurisdictional amount. Since such a suit is not maintainable, it is necessary to determine the potential claims of the plaintiffs. In this regard defendant alleges that plaintiff Cable's claim is insufficient to allow jurisdiction, however, it appears that the alleged claims of the remaining named plaintiffs are sufficient.

This is not an aggregation situation, although many courts have characterized similar cases as such and have dismissed the action. See generally Oliver v. Alexander, 6 Pet. 143 (U.S.1832); Pinel v. Pinel, 240 U.S. 594, 36 S.Ct. 416, 60 L.Ed. 817 (1916) and Takashi Kataoka v. May Dept. Stores Co., 155 F.2d 521

12. Amended Rule 23(a) provides: "Prerequisites to a class action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims, or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

(9th Cir. 1940), Hackner v. Guaranty Trust Co. of New York, 117 F.2d 95 (2nd Cir. 1941); Mitchell v. Great American Indemnity Co., 87 F.Supp. 961 (W.D.La.1950); compare address by Judge Marvin Frankel, Some Preliminary Observations Concerning Civil Rule 23, Eighth Circuit Judicial Conference, Sept. 18, 1967, at p. 10.[13]

In this situation it would seem that jurisdiction of the entire action has been invoked by plaintiffs Lucas' and Feezer's satisfaction of the requisite amount and the amount of plaintiff Cable's claim would not seem critical. See Note, The Federal Jurisdictional Amount Requirement and Joinder of Parties Under The Federal Rules of Civil Procedure, 27 Ind. L.J. 199 (1952). Nonetheless, such an approach has been objected to as an extension of the court's jurisdiction violative of Rule 82 of the Fed.Rules of Civ. Proc. See Diepen v. Fernow, 1 F.R.D. 378 (W.D.Mich.1940).

However, Rule 82 has not been a substantial obstacle when a court chooses to exercise its ancillary jurisdiction in other areas concerned with joinder, although ancillary jurisdiction may not properly attach in every case where joinder is appropriate. See Fraser, Ancillary Jurisdiction and the Joinder of Claims in the Federal Courts, 33 F.R.D. 27 (1963). Ancillary jurisdiction exists to effectuate judicial economy and efficiency, to prevent piecemeal litigation of connected claims which would otherwise result from the limited jurisdiction of the federal courts, but most importantly, to render more complete justice and convenience to litigants. Fraser, supra, p. 27. This policy would seem to be frustrated by dismissing Cable's claim, which arises from the same occurrence as that of his co-plaintiffs, and relegating him to a duplicative suit in a state court. See cf. Borror v. Sharon

Steel Co., 327 F.2d 165, 174 (3rd Cir. 1964).

In circumstances fairly analogous to the instant case the approach here suggested, to some degree, has been followed in order to avoid such a multiplicity of actions: In Wiggs v. City of Tullahoma, 261 F.Supp. 821 (E.D.Tenn.1966), and Raybould v. Mancini-Fattore Co., 186 F. Supp. 235 (D.C.Mich.1960) plaintiffs joined in their representative capacities did not claim the requisite jurisdictional amount. However, the demands of the beneficial plaintiffs were permitted to "ride on the coattail" of the individual plaintiff's claims. In Orn v. Universal Automobile Assn. of Ind., 198 F.Supp. 377, (E.D.Wisc.1961), the court accepted jurisdiction on a motion to remove. See Morris v. Gimbel Bros., Inc., 246 F.Supp. 984 (D.Pa.1965). Also dicta in Lauf v. Nelson, 246 F.Supp. 307, 309–310 (D.Mont.1965).

Plaintiffs cite the recent decision in Johns-Manville Sales Corp. v. Chicago Title & Trust Co., 261 F.Supp. 905 (N.D. Ill., E.D.1966) as determinative of the question now before the Court. In that case the court held that although the corporate co-plaintiff claimed damages less than the required jurisdictional amount, since joinder was proper and the court was required to try the case with or without the co-plaintiff, there was jurisdiction of the claim under the ancillary jurisdiction doctrine.

The court pursued a discussion of ancillary jurisdiction and then stated:

"The reasons and underlying considerations behind the jurisdictional amount requirement further indicate a resolution of this issue in favor of permitting the joined plaintiff's claim to remain along with the claim of the plaintiff over whom the court's jurisdiction clearly attaches. The juris-

---

13. The traditional question arises as to whether the plaintiffs are here claiming a "single title or right" or asserting separate and distinct claims with respect to the pension fund. See Barron and Holtzoff, supra, § 24 at p. 114. The correct

characterization of the claims is not readily apparent and does not necessarily need to be decided in view of the Court's power to hear ancillary claims. See Johns-Manville Sales Corp. v. Chicago Title & Trust Co., supra.

dictional amount requirement, as most limitations on federal jurisdiction, was intended to reduce the burden on federal courts and to avoid further encroachments on state courts. These purposes are in no way disserved by retaining the additional plaintiff in this case." At p. 907.

The advantage of retaining jurisdiction of plaintiff Cable's claim inures as well to the defendant by eliminating the necessity of defending actions on essentially the same claims in both state and federal courts. The extreme limitation on joinder and a fear of forum shopping, considerations which historically justified the narrow construction of the jurisdictional amount requirement, no longer have sufficient force to sustain a summary rejection of the rationale advanced in *Johns-Manville*, supra, especially in view of its application of ancillary jurisdiction. See Note, Ind.L.J., supra.

The Court is influenced by the expression of liberality toward joinder and third party practice found more and more commonly in the federal decisions:

"These rules are a part of that fundamental tenet of modern procedure that joinder of parties and of claims must be greatly liberalized to provide at least for the effective settlement at one time of all disputes of which parts are already before the court." Lesnik v. Public Industrials Corp., 144 F.2d 968, 973 (2d Cir. 1944); See also United Artists Corp. v. Masterpiece Productions, 221 F.2d 213 (2d Cir. 1955).

In other closely related areas of multiparty practice the rationale here advanced has been long accepted. For example, it is almost undisputed that where a party may intervene as a matter of right no independent ground of jurisdiction need be shown. The intervention is regarded as ancillary to the main proceeding. 4 Moore's Fed.Prac., 2d ed. § 24.18 pp. 135–139. Yet the requisite conditions for intervention of right are not substantially more restrictive than those for joinder and the basic policies are identical. One of the more liberal constructions of the intervention rule is found in this circuit in Kozak v. Wells, 278 F.2d 104 (8th Cir., 1960), 84 A.L.R. 2d 1400. The validity of that decision has since been affirmed by amended Rule 24(a) (2). See 2 Barron & Holtzoff, supra, § 591 (1966 Supp. pp. 99–112).

The arguments advanced and the underlying policies embodied in that decision have equal force in the present circumstances. Certainly, it would seem that, all other things being equal, in the interests of efficient judicial administration, a party properly joined and before the court lacking only the jurisdictional amount should be in a position superior to the potential intervenor who lacks all jurisdictional requirements.

The argument advanced here is basically utilitarian. Its emphasis is aptly stated in the *Johns-Manville* case:

"Basically law is common sense. * * It is unthinkable under our present state of judicial administration to require the same case be tried separately in two different courts. Duplicitous expenses and an unjustifiable imposition on an already over-taxed judicial system run contrary to recent advancements in legal rules of procedure— most notably our own model Federal Rules of Civil Procedure." 261 F. Supp. at p. 908.

In the absence of contrary authority in the United States Supreme Court and in light of the liberality expressed by the Eighth Circuit Court generally in this area, the Court finds the approach followed in *Johns-Manville* persuasive and precisely determinative of the instant question. Accordingly, motion of defendant Seagrave to dismiss plaintiff Lawrence W. Cable for lack of jurisdiction is denied.

Upon the foregoing analysis, it is hereby

Ordered:

That motion of defendant Seagrave for summary judgment on plaintiffs' Internal Revenue count on the grounds that it fails to state a claim is hereby

granted. The Court sees no just cause for delay in entering this judgment after ten days have elapsed from the date this order is signed.

Let judgment be entered accordingly.

It is further ordered:

1. That the remaining motion of defendant Seagrave for summary judgment pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure for dismissal herein is hereby denied;

2. That this action is not maintainable as a class suit under Rule 23 of the Federal Rules of Civil Procedure and the case shall proceed as a suit by the named plaintiffs and not as a class suit with intervention allowed upon motion pursuant to Rule 24 of the Federal Rules of Civil Procedure and consistent with the directives of the Eighth Circuit Court in Kozak v. Wells, supra; and

3. That the remaining motions for dismissal on grounds of misjoinder and lack of jurisdiction herein are hereby denied.