William J. HARDY et al.

v.

H. K. PORTER COMPANY, INC.

Civ. A. No. 73–183.

United States District Court,
E. D. Pennsylvania.

July 16, 1976.

Harry C. Barbin, Barbin, Lauffer & O'Connell, Rockledge, Pa., for plaintiffs.

Edward W. Madeira, Jr., Charles J. Bloom, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

HANNUM, District Judge.

Plaintiffs are former employees of defendant who were discharged when defendant closed one of its plant facilities. They have instituted this lawsuit to recover pension benefits under a non-contributory, salaried employees pension plan maintained by defendant. Plaintiffs premise their right to recovery on a four count complaint, the essential allegations of which are summarized as follows: (1) defendant was unjustly enriched by the discharge of plaintiffs and the resulting forfeiture of plaintiffs' pension benefits; (2) the discharge of plaintiffs was a "mass separation" governed by the express terms of the pension plan; (3) the discharge of plaintiffs was a "partial termination" of the pension plan in accordance with the Internal Revenue Code; and (4) defendant administered the terms of the pension plan in a discriminatory manner.

Having heard the testimony of the witnesses for the plaintiffs and for the defendants during a three day trial before the Court without a jury, and on the basis of the pleadings, the stipulations and exhibits of the parties, the Court enters the following Findings of Fact, Discussion, and Conclusions of Law:

### FINDINGS OF FACT

1(a). Defendant, H. K. Porter Company, Inc., ("Porter" herein), is a corporation incorporated under the laws of the State of

Delaware, doing business in the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

1(b). William J. Hardy, John W. Mathieson, Arthur H. Naylor, George Pierson and Frank H. Schreiber, Jr., are citizens of the State of New Jersey. Harry Edward Fritz is a citizen of the State of Ohio. Earle Freeman Webster is a citizen of the State of Georgia.

2. On or about January 1, 1950, Porter acquired, by purchase, the Quaker Rubber Corporation, which owned and operated a manufacturing plant and offices at Comly and Milner Streets, Philadelphia, Pennsylvania.

3. The Quaker Rubber Works ("Quaker" herein), was operated as one of Porter's multiple divisions from 1950 through May, 1972.

4. Sometime prior to 1950 Porter established a pension plan for its salaried employees, described as the "Salaried Employees' Pension Plan of H. K. Porter Company, Inc., and Subsidiaries" ("Plan" herein). The Plan has been amended from time to time since its inception, the most recent amendment having become effective May 1, 1969.

5. The Plan provides that the Board of Directors of Porter shall appoint a Pension Committee, whose duties consist of the general responsibility for the administration and supervision of the Plan.

6. The members of the Porter Pension Committee consisted of the following officials of the Porter Company:

 (a) William Hartzell—Treasurer of Porter

 (b) J. N. Yorke—Vice President of Porter

 (c) Robert F. Rainey—Supervisor of Pensions for Porter.

7. For three years prior to its being closed, the Quaker Plant suffered substantial losses.

8. In September, 1971, Porter decided to shut down the Quaker Plant.

9. The shutdown began in October, 1971, and the plant was finally closed in January, 1972.

10. All employees of Porter employed at the Quaker Plant were discharged when Porter closed the plant.

11. Plaintiffs, all former salaried employees of Porter, were employed by Porter at it's Quaker Plant.

12. When Porter terminated the employment of plaintiffs, as a result of the closing of the Quaker Plant, all of the plaintiffs' rights to a pension under the Plan were terminated.

13. Porter has made and makes contributions to the H. K. Porter Company, Inc., Common Pension Trust ("Trust" herein) in respect of the Plan.

14. Under the Plan salaried employees made no contributions to the Trust.

15. The purpose of the contributions made by Porter to the Trust is to fund in advance, pension liabilities under the Plan.

16. The pension liabilities of the Plan, and the amount of annual contributions necessary to fund these liabilities properly, are determined annually by independent consulting actuaries engaged by Porter.

17. The amount of such annual contributions as ultimately calculated by the consulting actuary are not specifically allocable to individual participants in the Plan, as such, for the reason that contributions are not made to provide pension benefits for any specific individual participant prior to the time that benefits are payable.

18. A participating employee is one who satisfies the eligibility requirements for participation.

19. Employees become eligible to participate if they have been employed full-time by Porter as a salaried employee for three years, and are at least 30 and not more than 55½ years of age.

20. The expert actuary employed by Porter to determine the amount which Porter should contribute to the Trust to adequately provide for future pensions for Porter's employees uses certain factors and as-

sumptions in making such determination, including the rate of employee turnover.

21. The expert actuary did not change the factor for employee turnover for the years 1970, 1971, and 1972.

22. The accrued pension liability of Porter for the salaried employees of Porter employed at the Quaker Plant on December 31, 1971, was $270,523.00.

23. On December 31, 1971, the total accrued liability for all salaried employees' pensions was $9,572,646.00.

24. The net assets in the Trust at this time was $12,250,177.00.

25. On December 31, 1971, the assets in the Trust exceeded the total liability for salaried employees' pensions by $2,677,531.00.

26. Porter distributed to its salaried employees various booklets and other documents for the purpose of explaining to the employees the provisions of the Plan. (Plaintiffs' exhibits P–7 through P–14).

27. All of the plaintiffs received these Plan booklets while in the employ of Porter.

28. The booklets describing the Plan have always contained language similar to that of the most recent booklet published after the Plan was amended in 1969, which includes the following provisions:

(a) The material contained in these booklets briefly explains and illustrates the Pension Plan for salaried employees. The full terms and conditions of the Pension Plan are set forth in the full text of the Plan, and the text thereof will be controlling as to any questions which may arise concerning the Pension Plan. The Plan text is available for inspection at the office of the Secretary of the Pension Plan Committee, Pittsburgh, Pennsylvania.

(b) In the event your employment terminates before your 60th birthday, you will not be entitled to any benefits under the Plan.

29. The Plan document contains the following provisions which are relevant to the present controversy:

(a) "Active Service" or "service" shall mean all service as an employee during which the employee actually performs services for the Company, the period of any vacation or leave of absence with or without pay (including a disability leave of absence) which shall be approved by the Company; and that period during which an employee who is transferred to consultant status at a fixed or predetermined compensation serves in such consultant status and receives such compensation, whether or not he performs any services for the Company. [Section II(K) of the Plan].

(b) No person prior to his retirement from the Company . . . shall have any right . . . to any portion of any funds which may be paid into any pension trust . . . [Section VIII of the Plan].

(c) Participation in the Plan shall not give any right to any employee to be retained in the employ of the Company nor shall it interfere with the right of the Company to discharge any employee and to deal with him without regard to the existence of the Plan and without regard to the effect such treatment might have upon him as a participating employee under the Plan. [Section IX(1) of the Plan].

(d) Any discretionary acts which may be taken pursuant to this Plan by the Pension Committee with respect to employees, pensioners and other persons entitled to a pension under the Plan shall be uniform in their nature, and applicable to all employees, pensioners and other persons entitled to a pension under the Plan in substantially identical situations. [Section X(8) of the Plan].

(e) "Company" shall mean H. K. Porter Company, Inc. and such divisions and such subsidiaries and affiliated corporations which may adopt the Plan as may be designated by the Board of Directors of H. K. Porter Company, Inc. The Board of Directors reserves the right from time to time to include in or withdraw from the Plan any division, subsidiary or affiliate. [Section II(a) of the Plan].

(f) In the event the corporate entity of the Company shall be lost as the result of any liquidation, merger, consolidation or other reorganization or in the event any petition in bankruptcy or insolvency shall be filed by or against the Company, this Plan shall thereupon ipso facto terminate . . . [Section XI(3) of the Plan].

(g) In the event of the termination of the Plan by the Company or upon complete discontinuance by the Company of contributions under the Plan, the rights of each employee and pensioner to benefits accrued to the date of such termination or discontinuance shall thereupon become non-forfeitable . . . [Section XII(1) of the Plan].

(h) This Plan shall be construed, regulated and administered under and in accordance with the laws of the Commonwealth of Pennsylvania. [Section XIII of the Plan].

30. Normal retirement under the Plan is age 65 and early retirement may occur at any time within the five (5) year period prior to age 65.

31. Pursuant to the terms of the Plan, an employee who has been employed by Porter for more than three years and who meets other eligibility requirements and who reaches age 60 in company approved leave of absence status is entitled to receive a pension.

32. As many as 2200 salaried employees participated in the Plan in 1960 and as few as 264 in 1952.

33. During 1971, approximately 1290 individuals participated in the Plan.

34. Forty-eight (48) of the 1290 participants worked at the Quaker Plant during 1971.

35. As of December, 1971, there were more than 1250 individuals participating in the Plan.

36. The Plan continued to function after the closing of the Quaker Plant for more than 1200 participating employees still covered by it.

37. The participating salaried employees of Porter working at the Quaker Plant at the time it ceased operations constituted less than four percent of the total salaried employees then participating in the Plan.

38. Plaintiffs here constitute less than one percent of the participants in the Plan during 1971.

39. When Porter closed the Quaker Plant in the latter part of the year 1971, Mr. Bellew, the General Manager of the Quaker Plant, with the approval of Mr. Davison, Executive Vice President of Porter, and Mr. Morrow, President of Porter, adopted a policy of granting leaves of absence to certain salaried employees who had not yet reached age 60 until the time they reached age 60 when a pension was granted to them.

40. The following salaried employees at the Quaker Plant were granted leaves of absence from the date of termination until they reached age 60 and were then qualified for a pension:

(a) Joseph J. Roche terminated when age 59 years and 11 months with 36 years and 1 month service for purposes of seniority.

(b) Charles Boley terminated when age 59 years and 9 months with 31 years service for purposes of seniority.

(c) Edward J. Wright terminated when age 59 years and 6 months with 26 years and 1 month service for purposes of seniority.

(d) Alexander J. Molnar terminated when age 59 years and 1 month with 35 years and 6 months service for purposes of seniority.

41. The Ambridge Works, another division of Porter, was shut down in November, 1970; the salaried employees at this plant were also covered by the Plan.

42. When Porter closed the Ambridge Works, a number of salaried employees were granted leaves of absence until they reached age 60 at which time pensions were granted to them.

43. The following employees, whose employments were terminated upon the closing of the Ambridge Works were placed on

**1180**

leaves of absence until they became qualified to receive a pension at age 60:

(a) Harvey D. Brady terminated when age 59 years and 4 months with 33 years and 10 months service for purposes of seniority.

(b) Roy L. Cornell terminated when age 59 years and 2 months with 22 years and 7 months service for purposes of seniority.

(c) George Duffner terminated when age 58 years and 11 months with 42 years and 7 months service for purposes of seniority.

(d) Fred W. Sainer terminated when age 58 years and 2 months with 30 years service for purposes of seniority.

(e) Frank E. Johnson terminated when age 57 years and 11 months with 34 years and 11 months service for purposes of seniority.

(f) Michael B. Kaleugher terminated when age 58 years and 1 month with 41 years and 3 months service for purposes of seniority.

(g) Jack C. Maeder terminated when age 58 years and 5 months with 39 years and 6 months service for purposes of seniority.

44. With respect to the plaintiffs in this case, who were discharged as a result of the Quaker shutdown and. were denied pension benefits, the Court finds the following relevant facts:

(a) Harry Edward Fritz terminated when age 57 years and 2 months with 17 years service for purposes of seniority.

(b) William J. Hardy terminated when age 55 years and 7 months with 34 years and 10 months service for purposes of seniority.

(c) John W. Mathieson terminated when age 57 years and 10 months with 23 years and 9 months service for purposes of seniority.

(d) Arthur H. Naylor terminated when age 58 years and 6 months with 29 years and 3 months service for purposes of seniority.

(e) George Pierson terminated when age 55 years and 2 months with 35 years and 6 months service for purposes of seniority.

(f) Frank R. Schreiber, Jr., terminated when age 54 years and 6 months with 36 years and 5 months service for purposes of seniority.

(g) Earle Freeman Webster terminated when age 53 years and 7 months with 14 years and 7 months service for purposes of seniority.

45. Tsu-yi Loo is a qualified consulting actuary competent to ascertain the cost of an annuity contract from a commercial insurance company, which annuity would provide benefits equivalent to the benefits that each plaintiff would receive if he were granted a pension at age 60.

46. Based on the pertinent data respecting each plaintiff and the procedure for calculating the benefit in accordance with the Plan, the present value of the cost of a commercial annuity which would provide benefits equivalent to those each plaintiff would have received at age 60 are as follows for each plaintiff:

| | | |
|---|---|---|
| (a) | Harry E. Fritz | $29,807.00 |
| (b) | William J. Hardy | 20,322.00 |
| (c) | John W. Mathieson | 11,420.00 |
| (d) | Arthur H. Naylor | 9,963.00 |
| (e) | George Pierson | 13,169.00 |
| (f) | Frank M. Schreiber, Jr. | 14,512.00 |
| (g) | Earle F. Webster | 23,185.00 |

47. Porter received full benefit of plaintiffs' past services.

48. Porter deducted the contributions it made to the Trust for Federal Income Tax purposes.

49. The termination of plaintiffs' pension rights resulted in the recapture by Porter of accumulated pension credits.

50. Because of the forfeitures Porter would have reduced future contributions for the pensions of other employees.

51. The closing of the Quaker Plant was a business decision made by Porter without regard to pension rights.

52. Each plaintiff understood that in an individual sense if, for any reason, his employment with Porter terminated prior to his retirement at age 60, he would not receive a pension from Porter.

53. Porter intended to establish and maintain a pension plan which qualifies under the provisions of Section 401(a) of the Internal Revenue Code.

54. Porter favored certain employees discharged before reaching age 60 as a result of plant shutdowns by granting them leaves of absence whereas other employees in substantially identical situations were denied such an opportunity.

55. Both those employees granted leaves of absence and those employees not provided with leaves of absence were in substantially identical circumstances in that both groups were discharged prior to age 60 by plant shutdowns.

56. The sole purpose of granting the leaves of absence to those employees who received them was to qualify those employees for pension benefits upon their reaching age 60.

57. There was no express provision or express amendment in the Plan which authorized granting of leaves of absence to certain groups of employees or any employee solely to vest that group or that individual with pension benefits.

58. Because of the close relationship between management and the Pension Committee there could be no real independence between the two bodies with respect to actions taken by either under the Plan.

59. The Pension Committee exercised discretion in providing pension benefits to certain employees, who had been on leaves of absence until they reached age 60, when the Pension Committee was aware that the sole reason said employees were placed on leaves of absence was to qualify them for pension benefits.

60. All of the plaintiffs were excellent and loyal employees of Porter prior to the termination of their employments.

## DISCUSSION

### UNJUST ENRICHMENT

■ Plaintiffs contend that Porter would be unjustly enriched if their rights under the Plan were forfeited thus permitting Porter to retain the value of that part of plaintiffs' services for which Porter made contributions to the Plan in lieu of direct compensation. Plaintiffs place considerable reliance on the holding in *Lucas v. Seagrave Corporation*, 277 F.Supp. 338 (D.Minn.1967), wherein the Court discussed the applicability of a restitutionary recovery:

> If a plaintiff who has breached a contract by failure to fulfill a condition may recover for the benefit he confers, it would seem equitable that employees, who failed to perform the conditions of the pension plan (continued employment until retirement) because of a group termination, should be entitled to an amount equal to the benefit conferred on an employer. *Lucas, supra* at 344.

Undoubtedly Porter received favorable income tax treatment on the contributions it made and some benefit accrued to Porter from the continued employment of plaintiffs over the years prior to their discharge. Additionally, assuming plaintiffs' benefits are forfeited, Porter will acquire the advantage of reduced future contributions for those employees who remained participants of the Plan. Plaintiffs have not, however, attempted to prove the value of the benefit conferred with respect to each of their separate claims. It is noteworthy that in *Lucas* the employer's contributions were made to separate accounts for each employee-participant, which is not the case with the contributions made by Porter. Furthermore, the question arises whether enrichment alone is sufficient to support plaintiffs' claim.

■ Plaintiffs maintain that all that is required by *Lucas* is a showing of a benefit accruing to the employer. Although the Court in *Lucas* does not expressly provide that considerations of bad faith prompted it to look beyond the express terms of the pension agreement, it seems clear that in

denying defendant's motion for summary judgment on the unjust enrichment claim the Court was influenced by such equitable considerations. Other Courts have similarly determined that *Lucas* requires the element of bad faith: *Craig v. Bemis Company, Inc.* 517 F.2d 677, 684 (5th Cir. 1975); *Rothlein v. Armour and Company*, 377 F.Supp. 506, 511 (W.D.Pa.1974). See also, *Reilly v. Walker Brothers*, 425 Pa. 1, 229 A.2d 457, 462 (1967). Plaintiffs in the present matter have failed to present evidence of any improper motive on the part of Porter.

■ An equally important element of a quasi-contractural recovery in circumstances where there is a written pension plan is a clear demonstration that the pension plan participants did not assume the risk of the contingency which rendered complete performance impossible.[1] As stated in *Lucas, supra* at 345, the inquiry is:

> . . . Whether a pension plan contract, providing for forfeitures of employee contribution benefits, anticipates the contingency of a group termination.

The Plan in this instance is silent as to the possible occurrence of a plant shutdown. Plaintiffs endeavored to establish that the risk of this contingency was not assumed by them with evidence that certain former employees of Porter, who were terminated as a result of plant shutdowns, were granted pensions when their rights had not yet vested. This evidence, however, fails to indicate any understanding between the parties outside the express terms of the Plan regarding such a contingency.

Plaintiffs also sought to establish that the actuarily determined, assumed employee turnover rate of the Plan was significantly less than Porter's actual turnover experience, including the turnover resulting from the Quaker shutdown. They contend that a marked variance in these figures provides a strong basis on which to conclude that the Plan did not anticipate group terminations and therefore the risk of a plant shutdown could not be considered assumed by them. The only evidence produced in this regard was that before and after the Quaker shutdown there was no adjustment in the Plan turnover assumption. This does not indicate to what degree, if any, actual turnover differed from assumed turnover. Moreover, no conclusion may be drawn from the fact alone that forty-eight employee-participants were discharged at one time in view of the fact that there were 1290 participants at the time.

For the reasons discussed above the Court concludes that plaintiffs have not established their right to recover on a quasi-contractual theory of liability.

## MASS SEPARATION

The second basis of liability asserted by plaintiffs is premised on the contention that the Quaker shutdown was a "mass separation." In essence, they suggest that the Court should construe the Plan to provide that a plant shutdown is a complete "termination" as to those employee-participants who would be discharged thereby. The Plan clearly refers to a termination as a liquidation, merger, consolidation or other reorganization in which event accrued benefits would be distributed to participants. In this respect the clear intention of the Plan is that it would be terminated upon the happening of an event which alters the entire corporate structure of Porter.

■ The forty-eight employee-participants who were discharged at the Quaker Plant constituted less than four percent of the total participating employees. Further, the Plan is still functioning for those who remained salaried employees of Porter. Clearly, the Quaker shutdown resulted in an uncommon group termination of Porter employees, however, it cannot realistically be found to be a termination in the sense intended by the Plan. In this situation the Court is powerless to alter the express intention of the Plan: *Schneider v. McKesson & Robbins, Inc.*, 254 F.2d 827 (2d Cir. 1958); *Reilly v. Walker Brothers*, 425 Pa. 1, 229

[1] See generally: Bernstein, Employee Pension Rights when Plants Shut Down; Problems and Some Proposals, 76 Harv.L.Rev. 952 (1963).

A.2d 457 (1967); and therefore plaintiffs' second basis of liability must be rejected.

## PARTIAL TERMINATION

Plaintiffs argue under a third theory of liability that the Quaker shutdown constitutes a "partial termination" of the Plan in accordance with Section 401(a)(7) of the Internal Revenue Code. Essentially, that provision states that a pension plan is not qualified for income tax purposes unless it provides, inter alia, that pension benefits become vested and will be distributed upon the occurrence of a complete or partial termination of the pension plan.

Although, as plaintiffs contend, the Plan evidences some intention to be qualified under the Internal Revenue Code, it does not necessarily follow that the Internal Revenue Code is incorporated by reference and that it thus acts to vest rights in plaintiffs. *Lucas, supra* at 342; *Craig v. Bemis Company, Inc., supra* at 685. The only evidence presented by plaintiffs in support of their position is Porter's intention that the Plan be qualified. Accordingly, the Court finds that this third theory of liability is without merit.

## DISCRIMINATION

Plaintiffs' final argument in support of recovery has been labeled "discrimination." They contend that a number of former employees of Porter at both the Quaker Plant and the Ambridge Works (a plant which was shut down shortly before Quaker) were discriminatorily favored in that they were granted pensions in circumstances where their rights had not been vested.

In *Schneider v. McKesson & Robbins, Inc., supra,* the Court strictly construed the terms of an employees' pension plan and found that because the employees were discharged prior to reaching retirement age, they were not participants in the pension plan and they, therefore, had no assertable rights thereunder. In addition the Court provided that the pension plan was clear and unambiguous and that the opening and closing of sales offices, which effectuated the discharge of the aggrieved employees,

was a normal incident of the employer's business. Relevant to plaintiffs' instant contention is the *Schneider* Court's discussion of an aspect of the lawsuit wherein the employees alleged that the pension plan was not operated in accordance with the terms which governed it, i. e., granting a pension to an employee whose rights had not vested. The Court observed that:

> Even if we interpret appellants' contention as a suggestion that in practice the terms of the plan have been modified, the mere suspicion of such a modification cannot serve to create a genuine issue of fact. *Schneider, supra* at 831.

Unlike the situation in *Schneider,* plaintiffs in this case have produced substantial evidence indicating that in practice there has been a deviation from the terms of the Plan.

Under Pennsylvania law it has generally been held that pension benefits are not gratuities but rather payments made as deferred compensation for services previously rendered. *Lowe v. Jones,* 414 Pa. 466, 200 A.2d 880 (1964); *Levitt v. Billy Penn Corporation,* 219 Pa.Super. 499, 283 A.2d 873 (1971). It is also well settled that the creation of an employees pension plan constitutes an offer by the employer of a unilateral contract which is subject to acceptance by an employee who completes the specified performance. Upon performance of all the conditions of the offer the employee's right to pension benefits vests and there is a binding unilateral contract. *Boase v. Lee Rubber & Tire Corporation,* 437 F.2d 527 (3d Cir. 1970); *Hurd v. Illinois Bell Telephone Company,* 234 F.2d 942 (7th Cir. 1956); *Genevese v. Martin-Marietta Corporation,* 312 F.Supp. 1186 (E.D.Pa. 1969); *Siegel v. First Pennsylvania Banking and Trust Co.,* 201 F.Supp. 664 (E.D.Pa. 1961). It may also be said, however, that:

> Where a specific requirement of eligibility for benefits has not been complied with, obviously there is no contract for the employee to enforce. This, however, is for the reason that there has been no acceptance of the offer; not because

there has been no offer of a contract. *Siegel, supra* at 667.

Of central concern in the present circumstances is whether the condition of continued employment until age sixty (60) [2] compels a finding that plaintiffs have not performed the conditions of acceptance, and thus, do not have binding contracts with respect to their pension benefits.

The terms of the Plan do not explicitly provide that if an employee is terminated before reaching age sixty, as a result of a plant shutdown, he forfeits his right to pension benefits. Porter urges that the termination provision should be interpreted to include terminations resulting from plant shutdowns. It is clear that the condition is operative when a discharge occurs on an individual basis but this conclusion is not so easily reached when a group termination resulting from a plant shutdown takes place because, unlike the circumstances of *Schneider,* such occurrences cannot be considered a normal incident of Porter's business.

Porter's position that the condition should be strictly applied to plant shutdown discharges is controverted in large part by evidence that Porter inconsistently applied the terms of the Plan in such instances. Essentially, a number of former employee-participants of the Plan at both the Quaker Plant and the Ambridge Works, who had not reached age sixty at the time of the respective plant closings, were granted leaves of absence until they reached age sixty, at which time they received their pension benefits. Plaintiffs assert that the leaves of absence were granted "solely" to qualify those employees for pensions. Porter has offered no evidence which contradicts this contention. If other explanations for the granting of the questioned leaves existed, Porter having access to such information would be expected to produce it; from the failure to do so it is inferable that there is substance to plaintiffs' contention. Although the Plan contains no express limi-

tation on the reasons for granting leaves of absence, to do so with the singular motivation of vesting an individual with a pension is certainly at odds with the strict interpretation of the Plan presently urged by Porter.

Porter contends that with respect to the Quaker shutdown it adopted a policy of granting the leaves of absence to those employees who were fifty-nine years old with twenty-five years service for purposes of seniority at the time of termination. There was no evidence, however, that this alleged policy was ever formalized by amendment to the Plan. The apparent lack of logic in a pension plan policy which favors certain employees with twenty-five years service and excludes others (including several plaintiffs) who have in excess of thirty years service and the fact that no such alleged policy existed during the Ambridge shutdown raises significant doubt that this was ever a real consideration in granting pension benefits.

 In the exercise of its discretion Porter has dispensed with the condition of employment until age sixty in providing certain of its former employees with pension benefits. As to those employees the pension plan offer was, in effect, modified. Under the express terms of the Plan such acts must be uniform as to all employee-participants in substantially identical situations. [3]

Porter argues that the grant of the leaves of absence was a management decision and the Pension Committee in considering the favored employees as continuously employed and thus qualified to receive pension benefits exercised no discretion. The composition of the Pension Committee and its close relationship to management make it exceedingly difficult to believe that there was any independence between the two bodies. Moreover, in granting the leaves of absence solely for the purpose of vesting certain individuals, Porter's management infringed upon the one

---

2. Normal retirement is age sixty-five (65) but employees may qualify for early retirement at age sixty (60).

3. Finding of Fact No. 29(d).

area which should have been exclusively under the control of the Pension Committee. Given this circumstance it is inconsistent to now argue that the Pension Committee was in some way shielded from the decision to grant the leaves. To accept Porter's argument would be to blindly overlook the realities of what has occurred.

Porter further contends that plaintiffs are not in substantially identical situations with those former employees who were granted leaves of absence. If in granting the leaves Porter had formally amended the Plan there would be support, perhaps, for this position. As there was no clear delineation between the favored employees and plaintiffs, the only reasonable conclusion is that the substantially identical situation, as to the members of both groups, was that a plant shutdown caused a termination of their employments before any of these employees reached age sixty.

Inasmuch as each plaintiff has fulfilled all the conditions of acceptance of the pension plan offer, except the requirement of continuous employment until age sixty, which in accordance with the express language of the Plan cannot be found to apply to the Quaker shutdown; each plaintiff has a binding unilateral contract with respect to pension benefits and may enforce the Plan according to its terms. Therefore, each plaintiff is entitled to recover an amount sufficient to provide a benefit equivalent to that which each could have expected under the Plan.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this matter and venue is properly laid herein in the United States District Court for the Eastern District of Pennsylvania.

2. The pension plan contract in question is to be construed in accordance with the substantive law of the Commonwealth of Pennsylvania.

3. A necessary element of a quasi-contractual recovery where there is a written pension plan contract is a clear demonstration that the pension plan participants did not assume the risk of the contingency which rendered complete performance impossible.

4. In order to sustain a claim of unjust enrichment where there is an express contract it is not sufficient merely to show the retention of a benefit; the retention of the benefit must also be unjust.

5. A Court will construe contractual provisions only when they are ambiguous.

6. A plant shutdown cannot be considered a termination of the Plan when the clear and unambiguous intention of the contract is that a termination occurs upon the happening of an event which causes the corporate entity of Porter to be lost.

7. In absence of any evidence indicating that provisions of the Internal Revenue Code were intended to be used to interpret or define terms of the Plan; said provisions can have no bearing on the rights of employees under the Plan on the theory alone that the employer sought to have a qualified plan.

8. Pension benefits are not gratuities but rather payments made as deferred compensation.

9. The establishment of an employees' pension plan by an employer constitutes an offer of a unilateral contract to an employee which becomes binding upon the employer when all the conditions of acceptance are performed.

10. By the express terms of the Plan any discretionary acts taken by the Pension Committee must be uniformly applied to all employees in substantially identical situations.

11. Where all the conditions of acceptance of a pension plan offer are performed by an employee except one, which by the express terms of the contract cannot be considered a condition of acceptance in a given circumstance, the employee has a binding unilateral contract with respect to pension benefits in that circumstance.