Carole SHAW, Robert C. Allott, Harold E. Anderson, Jim Baker, Richard Bringolf, Susan E. Davenport, Wilbur E. Hamborg, Wayne Hemmen, Louis E. Weidner, Jr., and Edward E. White, Plaintiffs,

v.

David KRUIDENIER, Milton O. Riepe, Harold E. Baker, Alfred G. Ellick, Herbert Harris, Joseph F. Rosenfield, James W. Wallace, R. J. Fleming, C. Dean Carlson, Dewayne Ehler, and Northern Trust Company, Trustee of the National By-Products Profit-Sharing Retirement Trust, Defendants.

Civ. No. 76–272–2.

United States District Court, S. D. Iowa, C. D.

May 14, 1979.

Richard J. Howes, F. Richard Lyford, Richard A. Malm, Ronald L. Anderson of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, Iowa, for plaintiffs.

Brent B. Green and Carlton T. King of Gamble, Riepe, Burt, Webster & Fletcher, Des Moines, Iowa, for defendants Kruidenier, Baker, Ellick, Harris, Rosenfield & Wallace.

Paul F. Ahlers and David H. Luginbill of Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, Iowa, for defendants Riepe, Fleming, Carlson and Ehler.

Hearst Randy Duncan, Jr. and Steven K. Scharnberg of Duncan, Jones, Riley & Finley, Des Moines, Iowa, for defendant Northern Trust Co.

## I.

HANSON, Senior District Judge.

This matter is before the Court on cross-motions for summary judgment submitted by the parties. Plaintiffs seek to recover certain employer contributions to a profit-sharing retirement plan in which plaintiffs were participants. The Court has jurisdiction under 29 U.S.C. § 1132.

Plaintiffs were employees of Des Moines Dressed Beef, Inc. (Dressed Beef), a corporation purchased by National By-Products, Inc. (National) in July 1970 and sold in September 1975. During the interim of National's ownership, plaintiffs were permitted to participate in the National By-Products Profit-Sharing Retirement Trust (the Trust) under the terms of which contributions were made by National from its annual net profit to the Trust on behalf of plaintiffs and other participants. After the sale of Dressed Beef, plaintiffs' participation in the Trust was terminated and each was paid the amount of his or her vested interest in the Trust funds which in each case was a percentage of the total amount of employer contributions depending on the length of the individual employee's service. Under the vesting schedule established in the Trust plan, none of the plaintiffs could claim a 100% vested interest. In their complaint, plaintiffs seek the full amount of National's contributions to their accounts. With some overlap, the defendants include the successor trustee of the Trust, Northern Trust Company (Northern), the individual members of National's Board of Directors (defendants Kruidenier, Riepe, Baker, Ellick, Harris, Rosenfield, Wallace, Fleming and Carlson), and individual members of the Advisory Committee responsible under the terms of the Trust plan for administering and managing the plan (defendants Fleming, Carlson and Ehler).

Plaintiffs' amended complaint is in four counts. Counts I and II are brought against the defendant members of National's Board of Directors and Northern. Count I appears to be predicated on the operation of the Internal Revenue Code on the Trust. Plaintiffs allege, *inter alia*, that

the sale of Dressed Beef and the consequent termination of plaintiffs as eligible employees "amounted to the termination of the Trust as to Dressed Beef and its employee-participants in the Trust, and as such required full vesting of participants' rights in accordance with the Internal Revenue Code of 1954 and regulations thereunder."[1]

Count II alleges that under the terms of the Trust plan itself plaintiffs were entitled to full vesting.

Count III and Count IV are substantively identical to Counts I and II, but substitute as defendants the members of the Advisory Committee.

By a second amendment to their complaint, plaintiffs have added as a prayer for relief to each count a request "for such further equitable relief as may be just and equitable in the premises."

Plaintiffs' submissions in support of their motion for summary judgment and against the defendants' various motions reveal that their legal theories are both more diverse and more complex than revealed in their complaint. Plaintiffs have framed the issues and the facts on which their cause is based in a document entitled "Plaintiffs' Contentions of Facts and Law," as amended. Plaintiffs' January 10, 1978 brief elaborates on their legal contentions:

This case is both one of contract and of a breach of fiduciary obligations. The issues in contract are:

1. Was there a termination or severance of employment under the trust agreement?

2. Did the Defendants frustrate the Plaintiffs' performance or cause a breach of contract, thereby excusing the Defendants from their performance, and requiring the Defendants to be liable for the balance of the funds extant in the respective Plaintiffs' accounts prior to the Board of Directors resolution in 1975?

In addition to the contract arguments there are fiduciary ones. Congress made all the Defendants fiduciaries effective January 1, 1975 [see 29 U.S.C. §§ 1002(21), 1109, 1114(a), 1144]. As such fiduciaries the Defendants owed certain obligations. . . .

Unfortunately for Plaintiffs, the substantive federal duties under ERISA do not become effective until January 1, 1976. In this year's "crack" falls the Plaintiffs' case.

January 10, 1978 Brief at 1–2. Thus plaintiffs pursue two contract theories predicated on interpretation of the contract and excuse of plaintiffs' failure to perform the requisite length of service prior to vesting; and join to their contract claims a claim of breach of fiduciary duties having its roots in the enactment of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. Plaintiffs' motion seeks summary judgment only on their contract claims.

All of the defendants have moved for summary judgment. Defendant Northern moves on the ground that the record shows that with respect to payouts of severance benefits it was subject to the direction of the Advisory Committee, that it had no discretionary authority in this regard, and under the terms of the Trust agreement its function was purely ministerial.

Defendants Kruidenier, Baker, Ellick, Harris, Rosenfield, and Wallace—all members of National's Board of Directors but not members of the Advisory Committee—similarly predicate their motion for summary judgment on the ground that they were not fiduciaries in the sense that they exercised discretionary authority or control over the Trust, see 29 U.S.C. § 1002(21)(A); and also assert that they were not parties to any contract with plaintiff or the trustee, or otherwise proper parties to the cause.

Defendants Riepe, Fleming, Carlson, and Ehler, who, with the exception of Riepe,

---

1. The complaint incorrectly states that the Trust was amended to provide that Dressed Beef was no longer part of the employer. The Trust was not amended, though National's Board of Directors adopted a resolution noting that with its sale, Dressed Beef should not further be considered a part of the employer.

constitute the membership of the Advisory Committee, do not, unlike the other defendants, address their motion to the question of whether plaintiffs' theories or recovery are properly directed at them. Instead, they join the legal issues with plaintiffs. They maintain, *inter alia*, that the uncontroverted facts show that plaintiffs' benefit rights had only partially vested at the time of the termination of their employment; that there was no obligation to permit plaintiffs to continue as plan participants until further vested; and that assuming they are fiduciaries, the facts betray no breach of fiduciary obligations.

The summary judgment record consists of affidavits, answers to interrogatories, and the deposition of defendant Carlson with exhibits. The Court has carefully reviewed the entire record and is convinced that there are no genuine issues of material fact and that all defendants are entitled to summary judgment. Because the substantive legal issues have been joined most directly by defendant Riepe and the Advisory Committee members, the Court has focused primarily on their motion as it relates to plaintiffs' cross-motion for summary judgment and resistance. It follows on the present pleadings and motions that if Riepe, Fleming, Carlson and Ehler are entitled to summary judgment, so too are the other defendants.

## II.

## STATEMENT OF FACTS

*The Trust*

In December 1962 National established the Profit-Sharing Retirement Trust. The Trust plan is embodied in an agreement between National and then trustee, Bankers Trust Company. The agreement was amended in 1975 when Northern became trustee, and effective January 1976 was amended to comply with ERISA.

As its name would suggest, the Trust is funded solely through contributions from the annual net profits of National and its subsidiaries. The Trust is intended to qualify and did qualify as a tax exempt profit-sharing trust under Subchapter D, Subtitle A of the Internal Revenue Code, *see* 26 U.S.C. §§ 401(a)(3), 501(a) (1970) (401(a)(3) amended 1974). National has taken tax deductions for its contributions pursuant to 26 U.S.C. § 404(a). The Trust provides benefits only for salaried employees as opposed to hourly wage earners. In addition to being salaried, to become eligible as a participant an employee must complete "not less than two fiscal years of continuous service as an employee" Art. II, ¶ 2.1(M). At the time pertinent to this litigation defendants Fleming, Riepe and Carlson served respectively as President, Secretary and Treasurer of National. Each of said defendants was a participant in the Trust. Defendant Ehler was also a plan participant.

Defendants Fleming, Ehler and Carlson comprised the Advisory Committee of the Trust, and were appointed by National's Board of Directors pursuant to a 1975 amendment to the Trust plan. Under the authority of Article IX of the Trust plan, the Committee exercised plenary authority to manage and administer the plan.

9.1 *Committee to Administer Plan.* The Advisory Committee shall manage and administer the Plan in accordance with the terms and provisions of this agreement and may do all acts and things necessary or convenient to the carrying out of the intent and purpose of the agreement and not inconsistent with the terms and provisions hereof, whether or not such powers and duties are specifically enumerated in this agreement. Not in limitation but in amplification of the foregoing, the Committee shall have power to determine any question as to the eligibility of any employee and to interpret or construe the Plan as set forth herein . . . . [T]he decision of the Committee upon all matters within the scope of its authority shall be final and conclusive upon the Employer, the Trustee, and the Participants and their Beneficiaries. To the extent reasonably possible the Committee shall not take any action or direct the Trustee to take any

action which would result in benefiting any Participant or group of Participants at the expense of another, or in discrimination as between Participants similarly situated or by application of different rules to substantially similar sets of facts. Under Article X the Trustee's duties with respect to paying benefits under the plan are primarily ministerial, and the Trustee is subject to the direction of the Advisory Committee in this regard. There is no evidence to suggest that in practice the Trustee has exercised greater authority than that outlined in the plan agreement.

Article VII deals with severance benefits. A severed employee is one whose employment is terminated "for reasons other than retirement, total disability or death." Art. II, ¶ 2.1(N). Depending on the length of time a severed employee has been a participant in the plan, an employee may forfeit some or all of the employer's contributions attributed to his account. Paragraph 7.1 provides in pertinent part:

> From the amount of the credit to his account on the fiscal anniversary date preceding severance there shall be applied the applicable percentage set forth below according to the number of full fiscal years the Participant has been covered by the Plan as follows:

| If Severance Occurs | Percentage Vested |
|---|---|
| Before 1 full fiscal year as a Participant | Nil |
| After: 1 full fiscal year as a Participant | 10% |
| 2 " " years " " " | 20% |
| 3 " " " " " " | 30% |
| 4 " " " " " " | 40% |
| 5 " " " " " " | 50% |
| 6 " " " " " " | 60% |
| 7 " " " " " " | 70% |
| 8 " " " " " " | 80% |
| 9 " " " " " " | 90% |
| 10 " " " " " " | 100% |

> and any residual balance in the Participant's account by reason of participation in the Plan for less than ten fiscal years shall be forfeited and allocated as elsewhere herein provided.

Any amount forfeited under this vesting schedule is distributed to the other plan participants' accounts.

Article XI deals, *inter alia*, with the termination of the plan or trust. In effect, if the trust is terminated, the plan provides for full vesting of the amounts credited to participants' accounts.

11.3 *Termination of Plan and Trust.* In the event that in accordance with foregoing section 11.2 the Employer terminates its contributions and at the time of terminating its obligation to make contributions, or at any time thereafter, the Employer decides to terminate the Plan and Trust and by resolution of its Board so directs, then, notwithstanding the provisions of said section 11.2, the Plan shall be terminated as of a date specified by the Board; and after payment of all expenses and after proportionate allocation of all gains, losses, earnings, miscellaneous adjustments and forfeitures in accordance, so far as applicable with Article IV, each Participant or beneficiary shall be entitled to receive the amount finally credited to his account.[2]

At the time National sold its Dressed Beef stock in September 1975 there were 110 participants in the plan.

*The Dressed Beef Participants.*

National is engaged in the business of production of animal by-products and operates a system of rendering plants for this purpose. Its operations are widespread and for the fiscal year ending December 31, 1976 it had sales in excess of $79,000,000. In December 1977 National had approximately 800 employees, 640 of whom were hourly wage earners and hence outside the purview of the plan in issue.

In August 1970 National acquired all of the outstanding common stock of Dressed Beef, which thereafter became a wholly-owned subsidiary of National. After the acquisition, National's Board of Directors adopted a resolution to the effect that Dressed Beef should be considered as part of the "Employer" as defined in the trust

---

**2.** Section 11.2 dealing with "Termination of Contributions" provides that if National elects not to make contributions in any fiscal year, "the amounts credited to the accounts of Participants shall fully vest as of the end of such fiscal year."

plan. This procedure is contemplated by Article II, paragraph 2.1(A) of the Trust plan which defines "Employer" as National "and any subsidiary, affiliate or associated corporation as in the future the Board may include. . . ." With the exception of Carole Shaw, plaintiffs were employees of Dressed Beef from 1970 through 1975 during the interim of ownership by National. Shaw was a National employee from 1966 until she transferred to Dressed Beef in September 1975. After the acquisition of Dressed Beef, plaintiffs became participants in the Trust plan.

In September 1975 National sold all of its interest in Dressed Beef to Owen Fleming, the brother of defendant R. J. Fleming. Shortly after the transaction National's Board of Directors adopted a resolution stating that Dressed Beef was no longer to be considered an "employer" within the meaning of the Trust plan, thus undoing the earlier 1970 resolution. On December 5, 1975, the Advisory Committee directed trustee Northern to pay plaintiffs the vested portion of the employer's accrued contributions in plaintiffs' respective accounts as determined by application of the vesting schedule contained in Article VII of the Trust plan, *ante.* Applying said formula, plaintiffs received the following amounts:

| | |
|---|---|
| Carole Shaw | $5,096.11 |
| Robert C. Allott | 557.91 |
| Harold Anderson | 3,661.48 |
| Jim Baker | 1,095.39 |
| Richard Bringolf | 1,296.19 |
| Susan Davenport | 1,271.35 |
| Wilbur E. Hamborg | 1,563.59 |
| Wayne Hemmen | 3,351.50 |
| Louis E. Weidner, Jr. | 2,441.15 |
| Edward E. White | 1,319.56 |

Plaintiffs received interest for the period the above amounts were in the Trust in 1975 and 1976 prior to distribution. No employer contributions were made for 1975. Plaintiffs subsequently unsuccessfully made demand on the Advisory Committee for the unvested balance.

Plaintiffs claim that as a result of the application of the Article VII vesting for-mula to them, the following amounts were forfeited from each individual plaintiff's account:

| | |
|---|---|
| Carole Shaw | $2,058.60 |
| Robert C. Allott | 2,103.47 |
| Harold Anderson | 3,451.16 |
| Jim Baker | 2,409.12 |
| Richard Bringolf | 2,850.72 |
| Susan Davenport | 1,797.47 |
| Wilbur E. Hamborg | 3,438.82 |
| Wayne Hemmen | 3,158.99 |
| Louis E. Weidner, Jr. | 5,368.85 |
| Edward E. White | 2,902.11 |

The total amount of these forfeitures was reallocated to the accounts of the remaining participants in the Trust on December 31, 1975. As participants, defendants Carlson, Ehler, Fleming, and Riepe, like other participants, each were credited with a proportionate share of the aggregate amount of plaintiffs' forfeiture.

Plaintiffs have presented evidence which raises a genuine issue as to whether certain participants in the plan were "employe[s]" as defined in Article II, paragraph 2.1(K): ". . . any person (including an officer or director) who is regularly employed by the Employer, received regular compensation therefor and whose customary employment by the Employer is for more than twenty hours per week and for more than five months per year." Plaintiffs take particular aim at defendant Riepe, and one Harry Galinsky, from whom National acquired Dressed Beef and who allegedly remained on the payroll under National's ownership. However, with respect to the application of the vesting formula to terminations of employment by severance under Article VII, there is no allegation or evidence that defendants discriminated against plaintiffs. *See* Ans. to Interrog. No. 16 propounded by Board of Directors defendants. Thus there is no claim or evidence that any terminated employee not entitled to full vesting under Article VII has ever been treated by defendants as enjoying fully vested rights. Defendants have filed affidavits stating there has never

been any discrimination. It follows that during the years plaintiffs were employees of National/Dressed Beef forfeitures by terminated plan participants were proportionately credited to plaintiffs' accounts.

The sale of Dressed Beef and subsequent resolution by National's Board resulted in the removal of Dressed Beef from the Article II definition of "Employer" and its employees from the definitions of "employe," "eligible employe," and "participant," Art. II ¶¶ 2.1(A), (K), (M), and (O). The cessation of plaintiffs' employment was treated by the Advisory Committee as a "termination of . . . employment . . . for [a] reason other than his retirement, total disability or death . . . ." under paragraph 7.1 of Article VII. This severance treatment of the employees of a sold-subsidiary was consistent with a course that had been pursued in 1965 in connection with the sale of National's fertilizer division. At the time National's Board of Directors expressed an interest in treating ten fertilizer division participants' plan shares as fully vested. Secretary and legal counsel for National, defendant Riepe, in a lengthy legal opinion reviewed the options and concluded contrary to the Board's wishes that the termination of the employees should be treated as a severance subject to the forfeiture provisions of Article VII. This was in fact the course pursued, with separate severance pay paid to the employees from other funds.

In view of the fertilizer division episode and the plaintiffs' disavowal of any claim of discriminatory application of paragraph 7.1, the Court concludes that the vesting schedule therein has been consistently and non-discriminatorily applied during the history of the Trust.

## III.

### CONCLUSIONS OF LAW

The Court approaches the legal issues from the same perspective employed by plaintiffs in their "Contentions of Fact and Law" as amended. The Court therefore deals respectively with plaintiffs' "contract theory" and "fiduciary theory."

*Contract Theory.*

#### A.

Plaintiffs' contract theories are predicated in the first instance on construction of the Trust plan language, and common law principles governing the obligations of the parties to a contract. Plaintiffs rely heavily on Iowa law, and all parties rely on pre-ERISA contract principles generally and as they relate to pension plans. The immediate problem faced by the Court concerns the impact of the preemption provisions of ERISA. ERISA Sections 514(a), (b)(1), 29 U.S.C. § 1144(a), (b)(1) provide that with respect to actions such as this which arose after January 1, 1975, ERISA's general and regulatory provisions "supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . ." *See Winer v. Edison Brothers Stores Pension Plan,* 593 F.2d 307, 313 (8th Cir. 1979). Subsection (c) gives comprehensive scope to the definition of "state law" and includes legislative, judicial or administrative action having the effect of law. 29 U.S.C. § 1144(c).

Section 514(b)(1) states: "This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975." At issue in *Winer, supra* was a situation similar to the one here involving an ERISA cause of action which arose after January 1, 1975 but involved in part matters occurring prior to that date. 593 F.2d at 313. In holding that the cognizable "act or omission" occurred subsequent to January 1, 1975, the Eighth Circuit quoted with approval the following construction of the "act of omission" language in subparagraph (b)(1):

[T]hat clause was apparently intended to permit courts to apply state law, even if the cause of action accrued after January

1, 1975, in cases where that result most fairly accommodates the interests of all affected parties—the beneficiaries, participants, and fiduciaries of the contributors to ERISA trusts. Courts must try to phase ERISA in as rapidly as possible without judging the conduct of affected persons by standards different from those which applied when they acted.

*Id. quoting Bacon v. Wong*, 445 F.Supp. 1189, 1192 (N.D.Cal.1978). Similarly, the critical acts or omissions here occurred after January 1, 1975 and thus state law does not supply the rule of decision, but unlike *Winer*, the forfeiture of plaintiffs' unvested benefits in late 1975 occurred before ERISA was effective to regulate the content of benefit plans.

As *Winer* and *Bacon* suggest, Congress did not intend to render prior law irrelevant where it fairly accommodates the interests of the parties and is not inconsistent with ERISA's purposes. Moreover, it was intended that federal courts would develop a body of federal substantive law in interpreting or construing private welfare and pension plans. *See Taylor v. Bakery and Confectionary Welfare Fund*, 455 F.Supp. 816, 819 (E.D.N.C.1978). Obviously a body of law does not spring from whole cloth. When the question is what do the terms of the plan mean, and the terms in question are not plainly inconsistent with ERISA, the Court finds no incompatibility between the pre-ERISA contract principles briefed by the parties, and the Congressional purpose to invest private benefit plans with an "equitable character" for which plan fiduciaries are accountable. 29 U.S.C. § 1001. *Cf. Winer v. Edison Brothers Stores Pension Plan*, 593 F.2d at 314; *Fremont v. McGraw-Edison Co.*, 460 F.Supp. 599, 601 (N.D.Ill.1978); *Amory v. Boyden Associates*, 434 F.Supp. 671, 672 (S.D.N.Y. 1976); *Keller v. Graphic Systems of Akron, Inc.*, 422 F.Supp. 1005, 1009 (N.D.Ohio 1976)

(cases involving forfeitures accomplished through "bad boy" clauses or non-competition forfeiture clauses). Therefore, in resolving plaintiffs' contract claims the Court has borrowed from general contract principles relying principally on Iowa law.

### B.

Plaintiffs maintain that the Trust plan is a contract; that any ambiguity in the plan is to be construed in their favor; and that language in the plan expressing an intent to create a tax-exempt profit sharing plan, Art. III, ¶ 3.6, should, in view of applicable IRS regulations require a construction of the termination of Dressed Beef as part of the employer as a termination of the Trust as to the class of eligible Dressed Beef employees with consequent full vesting under Article XI of the plan. In short, it is plaintiffs' position that "[t]he Trust left the Plaintiffs; the Plaintiffs did not leave the Trust. That is a termination of the Trust as to the Plaintiffs." January 10, 1978 Brief, at 6.

The parties are in agreement that under pre-ERISA Iowa law the Trust plan is a unilateral contract and may be sued upon as such. *See Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4–5 (1st Cir. 1978); *Van Hosen v. Bankers Trust Co.*, 200 N.W.2d 504, 506 (Iowa 1972). *See also Cardella v. Seither & Cherry Co.*, 255 N.W.2d 129, 131 (Iowa 1977); *Powers v. Fisher Controls Co.*, 246 N.W.2d 279, 280 (Iowa 1976); *Murphy v. R. J. Reynolds Tobacco Co.*, 260 Iowa 422, 148 N.W.2d 400, 403 (1967). The Court agrees with plaintiffs that the contract is an adhesion contract and that the Trust plan is to be construed in favor of plan participants in the event of any ambiguity.[3] *See Keller v. Graphic Systems of Akron, Inc.*, 422 F.Supp. at 1011. *Cf. Langer v. Iowa Beef Packers, Inc.*, 420 F.2d 365, 369 (8th Cir. 1970); *Van Hosen v. Bankers Trust Co.*, 200 N.W.2d at 508.

---

3. Though query, who are the pertinent plan participants? The remaining participants profited from the forfeitures.

It appears that the interpretation of the Trust plan does not depend on extrinsic evidence generating a genuine issue of material fact, *see Connie's Construction Co. v. Fireman's Fund Insur.*, 227 N.W.2d 207, 210 (Iowa 1975), thus the issue may be resolved by the Court. The Court concludes that the sale of a subsidiary and consequent termination of the employment status of subsidiary employees is unambiguously a severance termination of employment under Article VII of the plan and not a termination of the plan and trust under Article XI. *Cf. Dierks v. Thompson*, 414 F.2d 453, 457–58 (1st Cir. 1969).

Plaintiffs argue that "a termination of the Trust occurred as to the employees of Dressed Beef and Article Eleven of the Trust Agreement requiring complete vesting of the rights applies." January 10, 1978 Brief at 6. As the Court understands their brief, plaintiffs' premise is that as to them Dressed Beef, a subsidiary, was the "employer" under the plan, and in effect a termination of the plan by Dressed Beef occurred since plaintiffs did not leave Dressed Beef's employ. The plan, however, negates the premise. "The term 'Employer' means NATIONAL BY–PRODUCTS, INC., . . . and any subsidiary, affiliate or associated corporation as in the future the Board may include upon terms as by the Board prescribed." Art. II, ¶ 2.1(A). The frequent references to "the Employer" which permeate the plan can only mean that there is one employer under the plan consisting of the corporate group defined in paragraph 2.1(A). If a subsidiary is sold, it follows that the subsidiary employees are no longer "employe[s] of the Employer," Art. II, ¶ 2.1(M), and that a termination of employment occurs within the meaning of the plan. The Court perceives no ambiguity in this regard, nor have plaintiffs asserted ambiguity here.

Unless the Article XI plan termination provisions fairly cover the sale of a subsidiary, the Article VII graduated vesting schedule must govern the situation because Article VII is all-inclusive with respect to termination of employment "for *any* reason other than . . . retirement, total disability or death." Article XI, however, does not reflect an intent to embrace the termination of groups of employees occasioned by the sale of a subsidiary. Further, Article XI only looks to a complete, as opposed to a partial, termination of the plan. Paragraph 11.3 is most pertinent. It is entitled "Termination of Plan and Trust" and provides in relevant part that if

> "the Employer decides to terminate the Plan and Trust and by resolution of its Board so directs, then, . . . the Plan shall be terminated as of a date specified by the Board; and after payment of all expenses and after proportionate allocation of all gains, losses, earnings, miscellaneous adjustments and forfeitures . . . each Participant or beneficiary shall be entitled to receive the amount finally credited to his account."

Paragraph 11.5 provides for the discharge of the Trustee upon distribution of the trust estate.

There was no Board resolution directing termination of the plan and Trust; both survived for the benefit of the employer's salaried employees. The resolution passed by the Board merely noted what is apparent from Article II, paragraph 2.1(A), that a sold-subsidiary is not within the definition of "employer." Article XI with its references to termination of the plan *and* Trust, the distribution of proceeds to *each* participant or beneficiary, and discharge of the Trustee in its tenor and language does not address itself to partial terminations.[4] Again, the Court's attention has not been directed to any genuine uncertainty as to the meaning of either Article VII or Article XI. *See Brammer v. Allied Mutual Insurance Co.*, 182 N.W.2d 169, 172 (Iowa 1970).

---

4. This is consistent with Mr. Riepe's February 1965 letter to the Board relative to the sale of National's fertilizer division wherein he opined that it would be "contrary to the clear present provisions of National's plan to conclude . . . that there was a partial termination of the plan . . . ." Riepe authored the plan as counsel for National.

Plaintiffs disclaim any intention of relying on a theory of partial termination, though in view of the plan language, it seems implicit in their contract claims. Instead, they assert that the plan should be construed consistent with the requisites to continuation of its tax exempt status. They do not seek reformation of the contract, but they do rely on plan language expressing a general intent to qualify for favorable tax treatment. Article III, paragraph 3.6 of the plan provides:

> 3.6 *Intention of Employer as to Compliance with Laws and Approval of Plan.* It is the intention of the Employer to create a "trust forming part of a . . . profit-sharing plan of an employer for the exclusive benefit of his employes or their beneficiaries" in accordance with provisions of section 401(a) of the Internal Revenue Code. The Trust is created in the anticipation that the plan will be approved by the Commissioner of Internal Revenue as qualified under section 401(a) and entitled to exemption from tax as provided by section 501(a) of the Internal Revenue Code of 1954, as amended. However, neither any failure of the Trust to qualify for such exemption for failure of the Commissioner of Internal Revenue to approve the Plan nor failure of the stockholders of the Employer to ratify the Plan shall entitle the Employer to return of any contribution made by the Employer.

Also relevant to the issue is Article II, paragraph 2.2(E):

> (E) The plan established hereunder by the Employer is embodied in its entirety herein and the Committee and Trustee shall not be required to make any reference to any other document for the purpose of interpreting or administering the Trust hereby created and the Plan herein set forth.

Both before and after the ERISA tax amendments in 1974, 26 U.S.C. § 401(a)(2) provided that a plan would constitute a qualified trust only "if under the trust instrument it is impossible . . . for any part of the corpus or income to be used for, or diverted to, purposes other than for the exclusive benefit of . . . employees or their beneficiaries." Regulations effective at the time the National plan was created and subsequent thereto further provided: "A trust forming part of a plan of several employers for their employees will be qualified if all the requirements are otherwise satisfied." Treas.Reg. § 1.401–1(d) (1956). A 1969 Revenue Ruling declared: "the provisions relating to qualification under Section 401(a) of the Code . . . are applicable to each employer separately." Rev. Rul. 69–250, *reprinted in* Mertens, *Law of Federal Income Taxation, 1969–1971 Rulings,* at 190. A subsequent ruling involving a group of corporations having a single plan adopted by each of the corporations in which forfeitures were reallocated to remaining participants regardless of which corporation they were employed by relied on Section 401(a)(2) and Rev.Rul. 69–250 to conclude:

> Since amounts contributed for, and allocated to, employees of one employer may (in the event of their forfeiture) be used for the benefit of the employees for another employer, the plan and trust in this case do not meet the requirement, with respect to *each* employer, that the corpus or income not be used for purposes other than for the exclusive benefit of his employees.

Rev.Rul. 69–570, *reprinted in* Mertens, *supra* at 475. *But see* Rev.Rul. 71–148, *reprinted in* Mertens, *supra* at 1256–57 ("forfeitures may be reallocated under some method that is reasonable, is consistently followed, and does not produce discrimination [in favor of supervisory or highly compensated employees]"); 26 U.S.C. § 414 (1976) ("employees of all corporations which are members of a controlled group of corporations . . . shall be treated as employed by a single employer"); 29 U.S.C. § 1060(a).

From these accumulated tax law sources plaintiffs argue that the failure to treat

Dressed Beef as a separate employer and the reallocation of its employees' forfeitures to National's participants is inconsistent with the qualification requirements of Section 401(a). Accordingly, since, it is argued, paragraph 3.6, *ante*, bespeaks an intention "to do everything within [the plan's] power to comply with the Internal Revenue Code to achieve the tax benefits which follow," the plan provisions should be construed to treat the sale of Dressed Beef as working a termination of the plan requiring full vesting as to Dressed Beef employees.

The Court will not speculate as to how the Commissioner would view the forfeitures in question. However, assuming that the tax status of the plan is imperiled by the reallocation of the forfeitures,[5] the tax intent provision of National's plan can not be construed as plaintiffs suggest.

Most courts, even those most sympathetic to persons in plaintiffs' position, have resisted arguments that pension or profit-sharing plans be construed consistent with the Internal Revenue Code as a matter of contract law. In *Craig v. Bemis Co.*, 517 F.2d 677 (5th Cir. 1975) (applying Minnesota law), employees discharged following a plant closing attempted to recover nonvested pension benefits under a plan including a tax intent provision similar to that found in Article III of the National plan, and additionally including language which rendered the plan null and void in the event of a failure to obtain IRS approval. *Id.* at 679, 685 & n.8. The Fifth Circuit, in affirming summary judgment in favor of the defendant company, rejected an equitable estoppel argument predicated on the company's failure to administer the plan in accord with Section 401. It concluded:

> [w]hile the tax status of the Plan may be of concern to the Company and the Commissioner of Internal Revenue, plaintiffs may not predicate their contractually-derived pension rights on the Company's tax exemptions, . . . .

*Id.* at 686. In reaching this result, the Fifth Circuit quoted with approval Judge Lord's comments in *Lucas v. Seagrave Corporation*, 277 F.Supp. 338, 343 (D.Minn. 1967) addressed to the same issue involving a non-contributory annuity plan:

> Although, as plaintiffs contend, the policy demonstrates some intention to qualify for deductions under the tax laws, it does not follow that, the policy being silent or ambiguous, the Internal Revenue Code acts to vest rights in the terminated employees. The Court feels that a less ambiguous demonstration of intent is necessary in order to draw such a conclusion. A specific indication of an intention to use the provisions of the Internal Revenue Code to interpret or define terms of the contract is absent. Given this absence, it seems fairly clear that the tax provisions are relevant only to the tax status of the plan. Thus, without a more demonstrable intention to abide by the Code's definitions, it would appear that the only consequence herein of the "partial termination" of a plan with the employer denying the accrued benefits would be a failure to qualify under the provisions so as to render improper an income tax deduction by the employer for its contributions.

*Accord, Hardy v. H. K. Porter Co.*, 417 F.Supp. 1175, 1183 (E.D.Pa.1976), *aff'd in part, rev'd in part mem.*, 562 F.2d 42 (3d Cir. 1977). *Lovetri v. Vickers, Inc.*, 397 F.Supp. 293, 300 (D.Conn.1975); *Rothlein v. Armour & Co.*, 377 F.Supp. 506, 512 (W.D. Pa.1974). *Cf. Langer v. Iowa Beef Packers*, 420 F.2d at 369–70.

Plaintiffs would distinguish *Craig*, *Lucas* and similar cases on the ground that they involved the question of tax intent vis-a-vis the so-called "partial termination" rule. Under certain circumstances a partial termination of the plan requiring full vesting as to the terminated employees may occur.

---

5. In fact, the Commissioner has never disqualified the National plan.

*See, e. g.,* Treas.Reg. § 1.4016(b)(2) (1963).[6] However this is a distinction without a difference. The central question is under what circumstances the Internal Revenue Code may be incorporated into a pension or profit-sharing plan for the purposes of construction and interpretation of the plan as a contract. Whether the tax aspect involves the consequences of reallocation of forfeiture or a partial termination is not significant.

■ This Court is in agreement with the Courts in *Craig* and *Lucas* to the extent that any intent to mandate construction and interpretation of the plan in accordance with the qualification requirements found in the Internal Revenue Code, regulations, and rulings should be clearly expressed in order to become an enforceable part of the contract. Such an expression is absent here; indeed, the opposite is true. Accordingly, the issue is resolved against plaintiffs as a matter of law. *See Langer v. Iowa Beef Packers, Inc.,* 420 F.2d at 367–68.

The National plan expresses nothing more than a general intent to qualify under Section 401. It does not purport to incorporate the Code; nor does it contain a promise to obtain or retain IRS approval.[7] In fact, outside Article III the plan discounts resort to extrinsic matter such as the Internal Revenue Code and the various regulations and rulings in order to interpret or administer the Trust and plan. Article II, paragraph 2.2(E) provides that the entire plan is embodied within the four corners of the plan agreement, and states that "the Committee and Trustee shall not be required to make any reference to any other document . . . ." in interpreting the plan. Significantly, paragraph 2.2 is entitled "Construction" of the plan, whereas Article III deals with "Contributions" by the employer. Indeed, the intention to qualify found in paragraph 3.6 is prefatory to National's renunciation of any right, title or interest in contributions to the Trust in the event the Trust plan should fail to qualify or be approved. Paragraph 3.6 is inadequate both in its terms and in view of paragraph 2.2(E) to make the failure, if any, to treat plaintiffs in accord with Section 401(a) a factor requiring a different interpretation of the contract.[8]

■ Plaintiffs also assert that defendants prevented them from performing un-

---

**6.** (2) For purposes of this section, the term "termination" includes both a partial termination and a complete termination of a plan. Whether or not a partial termination of a qualified plan occurs when a group of employees who have been covered by the plan are subsequently excluded from such coverage either by reason of an amendment to the plan, or by reason of being discharged by the employer, will be determined on the basis of all the facts and circumstances . . . .. However, if a partial termination of a qualified plan occurs, the provisions of section 401(a)(7) [26 U.S.C. § 401(a)(7) (1970) (amended 1974 and recodified at 26 U.S.C. § 411(d)(3))] and this section apply only to the part of the plan that is terminated.

**7.** In contrast, the retirement plan agreement in *Craig v. Bemis Co.* provided in pertinent part:

The Company agrees promptly to submit this agreement to the Internal Revenue Service for ruling and approval. The Company and the Union agree to make any amendments to this agreement and The Plan as may be necessary to obtain and retain such ap-

proval. In the event the Company is unable to obtain such approval, then this Agreement shall be null and void.
517 F.2d at 685 n.8.

**8.** Though plaintiffs do not request it, if plaintiffs' first claim is truly a contract claim the Court believes that the plan contract would require reformation in order for the contract to express an intent to either incorporate the Internal Revenue Code or to treat the sale of a subsidiary as a full vesting event. *See, e. g., Kufer v. Carson,* 230 N.W.2d 500, 504 (Iowa 1975). Generally, unilateral contracts are not subject to reformation because reformation is dependent on mutuality:

[E]quity will grant relief if an instrument as written fails to express the true agreement between the parties without regard to the cause of the failure to express the agreement as actually made, whether it is due to fraud, mistake in the use of language, or anything else which prevented the instrument from expressing the true intention of the parties.
*Id. See* 66 Am.Jur.2d § 42.

der the Trust plan, viz. that they were not permitted to work for the requisite period of time in order to fully vest contributions to their accounts; and that defendants should not be able to invoke forfeitures that by their own action defendants caused. In support of their position, plaintiffs refer the Court to an Eighth Circuit case involving an option contract, *Langer v. Iowa Beef Packers, Inc., supra;* a bilateral corn growing contract, *Haase v. Stokely-Van Camp, Inc.,* 257 Minn. 7, 99 N.W.2d 898 (1959); and *Hardy v. H. K. Porter Co., supra,* involving a non-contributory salaried employees' pension plan.

The last of these cases reveals the fatal flaw in plaintiffs' frustration of performance claim. The other two cases are distinguishable on their facts as the contracts in neither case bear significant similarity to the unilateral contract reflected in the Trust plan here.

The *Hardy* case, which involved the application of Pennsylvania law, puts plaintiffs' contract claims in the proper context:

It is also well settled that the creation of an employees pension plan constitutes an offer by the employer of a unilateral contract which is subject to acceptance by an employee who completes the specified performance. Upon performance of all the conditions of the offer the employee's right to pension benefits vests and there is a binding unilateral contract. . . . It may also be said, however, that:

Where a specific requirement of eligibility for benefits has not been complied with, obviously there is no contract for the employee to enforce. This, however, is for the reason that there has been no acceptance of the offer; not because there has been no offer of a contract. [*Siegel v. First Pennsylvania Banking and Trust Co.,* 201 F.Supp. 664 (E.D.Pa.1961)] (Other citations omitted.)

*Accord, Rochester Corp. v. Rochester,* 450 F.2d 118, 120–21 (4th Cir. 1971); *Lehner v. Crane Co.,* 448 F.Supp. 1127, 1136 n.16 (E.D.

Pa.1978). Iowa law apparently shares this perspective on the formation and extent of the contract embraced in a pension or profit-sharing plan. The Supreme Court of Iowa has in the past enforced graduated vesting schedules according to their terms thus implicitly viewing the existence of a binding contract to pay benefits accrued a severed employee only to the extent an employee satisfies a vesting schedule. *See generally, Cardella v. Seither & Cherry Co.,* 255 N.W.2d at 130–31; *Keding v. Barton,* 261 Iowa 327, 154 N.W.2d 172, 173–74 (1967). Moreover, in *Van Hosen v. Bankers Trust Co., supra,* the Iowa court approved language in an Ohio case, *Cantor v. Berkshire Life Insur. Co.,* 171 Ohio St. 405, 408–09, 171 N.E.2d 518, 520–21 (1960) to the effect that enforceable contract rights arise from a pension plan where the employee "has complied with all the conditions of the plan." *Van Hosen v. Bankers Trust Co.,* 200 N.W.2d at 506; *Murphy v. R. J. Reynolds Tobacco Co.,* 260 Iowa at 429, 148 N.W.2d at 403 (1967).

Thus the offer in paragraph 7.1 of the Trust plan to fully vest employer contributions after an employee served 10 years as a plan participant remained an offer until the employee performed the stated period of service. It is not claimed that any of the plaintiffs contracted to remain in National's employ for the requisite number of years. Nor is it claimed that National was prohibited by contractual obligation from terminating plaintiffs as employees through the sale of their subsidiary employer. There was therefore no contract provision existing at the time plaintiffs were severed the plaintiffs' performance of which defendants could interfere with. *Cf. Lovetri v. Vickers, Inc.,* 397 F.Supp. at 301. At the most, plaintiffs were prevented from accepting the unilateral offer of full vesting after ten years implicit in paragraph 7.1; and to the extent plaintiffs did accept the offer of partial vesting by the length of their service as defined in the paragraph 7.1 vesting schedule, their contract rights are fully enforceable and have been satisfied by

defendants. As the Court of Appeals for the Fifth Circuit has observed, "the vesting requirements of a pension plan have never been held to imply a guarantee of employment until vesting has occurred." *Craig v. Bemis Co.,* 517 F.2d at 684. *See Gebhard v. GAF Corp.,* 59 F.R.D. 504, 506–07 (D.D.C. 1973).[9]

■ In their reply brief to the defendants' motion for summary judgment, plaintiffs place the gloss of ERISA on their contract claims, relying principally on *Amory v. Boyden Associates,* 434 F.Supp. 671 (S.D.N.Y.1976). *Amory* involved the forfeiture of vested benefits through application of a noncompetition *in terrorem* plan provision. *Id.* at 672–73. Like the present case, the alleged forfeiture occurred in the interim between the preemption of state law (January 1, 1975) and the effective date of ERISA's substantive provisions governing the contents of employee benefit plans (January 1, 1976). Faced with the question of what law to apply, Judge Knapp adopted the middle course.

It seems to us that during the interim between January 1, 1975 and January 1, 1976 declarations of forfeiture of vested pension rights must be subject to judicial scrutiny according to a reasonableness test. The standard of reasonableness, should, as a consequence of the public policy expressed in the Congressional mandate, be a rigorous one and should be applied both to forfeiture provisions and their application. . . . Indeed, we believe that during this interim period ERISA creates a presumption of unreasonableness in forfeiture provisions and

---

**9.** Plaintiffs might recover on contractual or quasi-contractual theories akin to their frustration claim if the full vesting provision was consideration for plaintiffs' promise to work a fixed period of time, *see Langer v. Iowa Beef Packers, Inc.,* 420 F.2d at 367–68; *Hablas v. Armour and Company,* 270 F.2d 71, 78–79 (8th Cir. 1959); if the Advisory Committee inconsistently applied paragraph 7.1, *see Hardy v. H. K. Porter Co.,* 417 F.Supp. at 1184–85; or if defendants severed plaintiffs' employment under the plan with a bad faith intent to deprive them of full vesting, *see Craig v. Bemis Co.,* 517 F.2d at 684; *Sides v. Federated Department Stores, Inc.,* 434 F.2d 992, 993–94 (5th Cir. 1970). Plaintiffs neither allege nor support the first ground, nor is there any evidence to support the third. With respect to the second ground, plaintiffs have specifically denied discriminatory application of paragraph 7.1 in interrogatories.

The court in *Lucas v. Seagrave Corp.* has perhaps come closest to embracing the equitable basis of plaintiffs' frustration claim. In overruling a successor employer's motion for summary judgment, the *Lucas* court drew from quasi-contractual theories of quantum meruit and unjust enrichment to suggest that the discharged employees could recover what the court viewed as compensation in the form of plan contributions. *Id.* at 344–46. A review of the opinion reveals that the court's decision was influenced by three factors; (1) the plan was a pension plan under which the employer paid annual premium payments sufficient to enable purchase of an annuity for each participant at a stated retirement age; (2) if an employee was terminated prior to retirement age, the accumulated benefits for the employee were forfeited and the forfeiture inured to the benefit of the employer in the form of a reduction in the next annual premium installments; and (3) plaintiffs alleged an "intentional plan . . . to unjustly recapture and exhaust . . . pension benefit forfeitures." *Id.* at 340, 346. None of these concerns are apposite to the present case. National gains nothing from the forfeitures, and though profit-sharing may be a form of compensation, the vesting schedule in essence provides that it is unearned until the employee has provided the requisite length of time in service. *See, e. g., Rochester Corporation v. Rochester,* 450 F.2d 118, 120–21 (4th Cir. 1971).

Plaintiffs have asserted that the National plan fails to allocate the risk that a subsidiary will be sold. To the contrary, the plan does allocate risk in general terms. In any event, risk allocation is primarily relevant to a quantum meruit claim involving forfeitures of pension plan benefits because of its relationship to actuarial assumptions determinative of the cost of a pension plan to the employer. *See Lovetri v. Vickers, Inc.,* 397 F.Supp. 293, 301–02 (D.Conn.1975), *citing* Bernstein, *Employee Pension Rights When Plants Shut Down: Problems and Some Proposals,* 76 Harv.L.Rev. 952, 967–70 (1963). Actuarial considerations have no ready application to National's profit-sharing plan. Participants do not receive a pension; merely retirement, disability and death benefits keyed to the amounts in their individual accounts. Art. V, VI. Moreover, National's annual contribution to the Trust is fixed in Article III on a basis that does not reflect actuarial assumptions. *See* 29 U.S.C. § 1023(d).

places the burden of proof on those who wish to apply them. (Citations omitted.) *Id.* at 673. *Amory* supplies little support to plaintiffs for two reasons. First, *Amory* addressed itself to an *in terrorem* forfeiture provisions purporting to divest and forfeit otherwise vested benefits. *Id. Cf. Winer v. Edison Brothers Stores Pension Plan,* 593 F.2d at 311. Inasmuch as the Congressional mandate spoken of by Judge Knapp not only fails to outlaw graduated vesting of employer benefit contributions, but indeed codifies them as minimum vesting standards in Section 203 of ERISA, 29 U.S.C. §§ 1053(a)(2)(A), (B), (C), the forfeiture of nonvested employer contributions here pursuant to a vesting schedule encounters no strong opposition from ERISA policy. *See, e. g.,* H.R.Conf.Rep. No. 93–1280, 93d Cong. 2d Sess. *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4639, 5049–50; 120 Cong.Rec. H8702 (daily ed. August 20, 1974) (remarks of Rep. Ullman), *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 5168. In fact, post-ERISA Treasury regulations specifically state: "To the extent that rights are not required to be nonforfeitable to satisfy the minimum vesting standards . . . they may be forfeited without regard to the limitations on forfeitability required by this section." Treas. Reg. § 1.411(a)–4(a) (1977). *See Fremont v. McGraw-Edison,* 460 F.Supp. at 602–03. Second, assuming the *Amory* rationale would apply, comparison of ERISA's minimum vesting standards with the graduated vesting schedule in paragraph 7.1 of National's plan, compels the conclusion that application of paragraph 7.1 according to its terms is conclusively reasonable as a matter of law. ERISA Section 203 provides three options for the vesting of employer contributions. The second of these, Section 203(a)(2)(B) provides that a plan meets the minimum vesting standards if not less than 25% of accrued benefits from employer contributions vest after five years of service, plus an additional 5% for the next five years, and 10% per year thereafter until employer contributions are fully vested. Even with the two-year service requirement

for "eligible employe[s]" now prohibited by ERISA, 29 U.S.C. § 1052(a)(1), the paragraph 7.1 vesting schedule providing increments of 10% over a ten-year period would appear to satisfy these requirements. In addition, paragraph 7.1 allows full vesting after 10 years as a participant in contrast to the fifteen years of service to full vesting under Section 203(a)(2)(B). But for the increment of the two years in service plan requirement in order to qualify as an "eligible employe," Art. II, ¶ 2.1(M), the paragraph 7.1 vesting schedule might also satisfy the Section 203(a)(2)(B) ten years of service to full vesting option. Thus because the paragraph 7.1 vesting schedule bears a substantial similarity to the minimum vesting standards in ERISA, plaintiffs cannot be heard to argue that paragraph 7.1 or its application fails to meet a reasonableness standard imposed by the public policy expressed in ERISA.

*Fiduciary Theory.*

The members of the Advisory Committee and allegedly the members of National's Board of Directors are fiduciaries under ERISA, 29 U.S.C. § 1002(21), and were so from January 1, 1975, 29 U.S.C. §§ 1114(a), 1144. Plaintiffs contend that whoever the chargeable fiduciaries are, they breached their obligations to plaintiffs in connection with the termination of plaintiffs' employment and forfeiture of unvested employer contributions.

From the foregoing discussion relative to plaintiffs' contract based allegations, it has been established that in administering the plan no contractual duty toward plaintiffs was breached; the Trust plan was administered in accordance with its terms; plaintiffs were properly and nondiscriminatorily treated as severed under Article VII when Dressed Beef was sold; and the resultant forfeiture of unvested employer contributions pursuant to the paragraph 7.1 vesting schedule was not at odds with the policy supporting ERISA and indeed bears a significant similarity to the minimum vesting standards in Section 203, 29 U.S.C. § 1053. In these circumstances the Court is convinced that plaintiffs can prevail on their

fiduciary theory only if there is evidence that plaintiffs' severance as plan participants was tainted by bad faith intention to deprive them of their unvested benefits or some other purpose outside the sphere of defendants' fiduciary duties.

Section 404(a)(1)(A) of ERISA directs plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." 29 U.S.C. § 1104(a)(1)(A). In this respect ERISA is similar to the traditional common law duty imposed on trustees. *See NLRB v. Local 1140,* 577 F.2d 16, 21 (8th Cir.) *cert. denied,* —— U.S. ——, 99 S.Ct. 839, 59 L.Ed.2d 35 (1978). However, in matters relevant here ERISA also codifies particular obligations of fiduciaries and, further, states that they may engage in certain kinds of activity consistent with their trust. Since in these regards ERISA was effective *and* preempted prior state law on January 1, 1975, the pre-ERISA state statutory and common law on which plaintiffs largely rely is not controlling.

Plaintiffs focus their fiduciary attack (1) on alleged self-dealing on the part of defendants Carlson, Fleming, Ehler, and Riepe who are alleged to have been both participants and fiduciaries; and (2) on the alleged fact that some personnel who did not qualify as employees or eligible employees, including defendant Riepe, were improperly permitted to participate in the plan.[10] Neither is sufficient to withstand summary judgment.

With respect to the first, plaintiffs bottom their alleged self-dealing on the fact that as participants, defendant fiduciaries benefitted from the reallocation of Dressed Beef forfeitures. This factor, however, loses significant probative force in the wake of ERISA. Section 408(c), 29 U.S.C. § 1108(c) permits plan fiduciaries to hold positions of responsibility with "a party in interest," as well as to participate in the plan they administer.

> (c) Nothing in section 1106 [prohibited transactions] . . . shall be construed to prohibit any fiduciary from—
>
> (1) receiving any benefit to which he may be entitled as a participant or beneficiary in the plan, so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries;
>
> .     .     .     .     .
>
> (3) serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest.

*See NLRB v. Local 1140,* 577 F.2d at 21 (8th Cir.). Thus the mere fact that individual fiduciaries as participants had credited to their accounts along with other participants a proportionate share of the accumulated Dressed Beef forfeitures does not amount to self-dealing in breach of the fiduciary duty created by ERISA. *See Marshall v. Snyder,* 572 F.2d 894, 901 (2d Cir. 1978). Moreover, inasmuch as Section 404(a)(1)(D) admonishes fiduciaries to administer plans

> in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter. [29 U.S.C. § 1104(a)(1)(D)]

defendants could have been exposed to liability for diminution of the Trust assets to the extent of the loss to the Trust of any distribution of unvested amounts to plaintiffs not provided for in the plan. *See Winpisinger v. Aurora Corp.,* 456 F.Supp. 559, 566 (N.D.Ohio 1978); Art. IX, ¶ 9.1 (containing a nondiscrimination clause).

Nor is the fact that some persons who did not qualify as participants were nevertheless permitted to participate in the plan probative of a breach of fiduciary

---

10. Plaintiffs have also asserted a fiduciary duty to administer the Trust plan in a manner which insures the retention of deferred income tax treatment for profit-sharing contributions. Assuming the existence of such a fiduciary duty, the fact remains that the National plan has not been disqualified and participants have enjoyed and continue to enjoy favorable tax treatment.

duty. This looks to the opposite end of the operation of the plan and accordingly has only inferential value, and that not strong. In any event, plaintiffs have not alleged that the Article VII vesting schedule has been inconsistently or discriminatorily applied, and on the undisputed facts the severance treatment of plaintiffs was in accord with the plan's terms.

In the final analysis there is no substantial or material evidence that any defendant did other than apply the plan to Dressed Beef employees in good faith and consistent with its terms. Though defendants acted during the "crack" in which state law was preempted and "replaced" by an undeveloped body of federal substantive law, it seems fair and equitable that during this interim so long as fiduciaries applied a then valid plan in good faith achieving results not plainly repugnant to the "equitable character" of ERISA, they should not incur liability for their actions.[11] Viewing the entire history of Dressed Beef's participation in the Trust, plaintiffs have not been the victims of inequity. Between 1970 and 1975 Dressed Beef was consistently a losing operation, making a small profit in only one year. It could not alone have supported a profit-sharing plan akin to National's, and the plan fiduciaries were under no obligation to include Dressed Beef employees when National purchased the company. Yet they did include Dressed Beef, and its employees shared alike in National's profits

while their own company contributed little or nothing. Indeed, some employees were credited with prior service to Dressed Beef. When Dressed Beef was sold five years later, the plan vesting schedule, which was not harsh or unreasonable, was applied to plaintiffs in evenhanded fashion. The resultant forfeitures of unvested contributions resulted in no unjust enrichment to the remaining participants who shared in the forfeiture. In a real sense, they only received a portion of what they would have received absent permitting Dressed Beef to participate in the plan.

There appearing no genuine issue of material fact and defendants having shown that there was no breach of any contractual or fiduciary duty owed plaintiffs, summary judgment will be entered for defendants.[12]

## IV.

## ORDER FOR JUDGMENT

In view of the foregoing and pursuant to Rule 56(c), F.R.Civ.P.,

IT IS ORDERED that plaintiffs' motion for summary judgment is overruled.

IT IS FURTHER ORDERED that defendants' motions for summary judgment, each and every one of them, are sustained.

IT IS FURTHER ORDERED that the Clerk enter judgment dismissing plaintiffs' amended complaint.

11. The Court has not addressed the fiduciary issue from the perspective of the pre-ERISA standard of review: whether the actions of plan administrators evince "fraud, bad faith or arbitrary action." *E. g., Powers v. Fisher Controls Co.,* 246 N.W.2d at 282. Though the Eighth Circuit has apparently preserved a similar standard subsequent to ERISA, *see Bueneman v. Central States Southeast and Southwest Areas Pension Fund,* 572 F.2d 1208, 1209 and n.3 (8th Cir. 1978); *but cf. Winer v. Edison Brothers Stores Pension Plan,* 593 F.2d at 312, it seems both logical and inevitable to this Court that endowed with the status of fiduciaries having particular duties codified in ERISA, a more exacting standard of review will evolve, at least with respect to many non-adjudicative functions. *See Winpisinger v. Aurora Corp.,* 456 F.Supp. at 567. Nonetheless, in the ab-

sence of bad faith or evidence of facts that belie the premise, the Court believes plan fiduciaries' interpretation and application of a plan in circumstances not involving a question of law is entitled to deference if well-grounded and not repugnant to ERISA's equitable purpose.

12. Plaintiffs have asserted defendants have the burden of proof on the fiduciary issue. *Cf. Bueneman v. Central States Southeast and Southwest Areas Pension Fund,* 432 F.Supp. 697, 699 (E.D.Mo.1977), *aff'd* 572 F.2d 1208 (8th Cir. 1978). Regardless of where the burden lies, the summary judgment record adequately demonstrates that there is no genuine issue of material fact and defendants are entitled to judgment as a matter of law.